ENVIRONMENTAL DEFENSE
FUND, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY and Lee M. Thomas,
Administrator, Respondents,

American Mining Congress, Idaho Min-
ing Association, Kennecott, The Fertilizer
Institute, Intervenors.

No. 86–1528.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 11, 1987.

Decided July 29, 1988.

Robert V. Percival, with whom, Alan S. Miller, Washington, D.C., Debra Hirshkowitz, (student counsel) and Jan Wagner (student counsel), were on the brief, for petitioner.

Scott A. Schachter, Atty., Dept. of Justice, with whom, Roger J. Marzulla, Acting Asst. Atty. Gen. and Margaret B. Silver, Atty., E.P.A., Washington, D.C., were on the brief, for respondent.

John N. Hanson, with whom, Donald J. Patterson, Jr., Edward M. Green, Washington, D.C., Roderick T. Dwyer for American Mining Congress; Richard A. Flye, Christian Volz, Carole Stern, Washington, D.C., for the Fertilizer Institute; Alfred V.J. Prather, Kurt E. Blase, Washington, D.C., for Kennecott and Robert M. Tyler, Jr., Boise, Idaho, for Idaho Mining Ass'n were on the joint brief for intervenors, American Mining Congress, et al. Kaye L. O'Riordan, Boise, Idaho, also entered an appearance for intervenor, Idaho Mining Ass'n.

Before MIKVA and SILBERMAN, Circuit Judges, and OBERDORFER,[*] District Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

MIKVA, Circuit Judge:

The Environmental Defense Fund ("EDF") challenges the decision by the Administrator of the Environmental Protection Agency ("EPA" or "the agency") to regulate wastes from the extraction and beneficiation stages of mining under Subtitle D rather than under the stricter standards of Subtitle C of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6921–6939b (1982 & Supp. III 1985). EDF asks the court to set aside EPA's exemption of mining wastes from Subtitle C regulation and to direct the agency to commence rulemaking to consider what Subtitle C standards should be applied to mining wastes determined to be hazardous. We disagree with EDF that the agency acted in contravention of the statute in deciding not to regulate these mining wastes under Subtitle C, and decline to disturb EPA's regulatory determination.

## I. BACKGROUND

### A. RCRA: Subtitles C and D

Congress enacted RCRA in 1976 to establish a comprehensive federal program to regulate the handling of solid wastes. Subtitle D of RCRA, 42 U.S.C. § 6941–6949a, addresses solid wastes, including wastes "resulting from * * * mining * * * operations," 42 U.S.C. § 6903(27), that do not qualify for regulation as "hazardous wastes" under Subtitle C. Under Subtitle D, states use federal financial and technical assistance to develop solid waste management plans in accordance with federal guidelines. EPA has authority under this Subtitle to promulgate criteria for classification of waste facilities as sanitary landfills and open dumps. § 4004(a), 42 U.S.C. § 6944(a). Facilities can be classified as sanitary landfills only if there is no possibility of danger to health or environment from deposits at those sites. The statute prohibits open dumping of potentially dangerous solid wastes, § 4005(a), 42 U.S.C. § 6945, and requires states to submit for EPA approval comprehensive solid waste disposal plans that include a prohibi-

tion of such unregulated dumping. §§ 4006, 4007, 42 U.S.C. §§ 6946, 6947.

Subtitle C of RCRA, 42 U.S.C. §§ 6921–6939b, regulates hazardous wastes and requires EPA to promulgate regulations to govern the treatment, storage, and disposal of these wastes. 42 U.S.C. § 6924. Under § 3001(b)(1) of that Subtitle, 42 U.S.C. § 6921(b)(1), Congress directed EPA to develop criteria to identify hazardous wastes and authorized the agency to list particular wastes as hazardous according to the § 3001(a) criteria. Generally wastes are considered hazardous under Subtitle C if they are listed as hazardous by the Administrator, *see* 40 C.F.R. §§ 261.11(b), 261.30–261.33 (1986), or they are found to have one of four technical characteristics of hazardousness, *see* 40 C.F.R. § 261.11(a)(1). These are ignitability, corrosivity, reactivity and EP toxicity (defined as the leaching of toxic residues into surrounding liquid). 40 C.F.R. §§ 261.20–261.24.

### B. Regulation of Mining Wastes

Congress enacted Subtitle C to address the hazards of industrial and manufacturing processing wastes. Recognizing that "information on the potential danger posed by mining waste is not sufficient to form the basis for legislative action," H.R.Rep. No. 1491, 94th Cong., 2d Sess. 15 *reprinted in* 1976, U.S.Code Cong. & Admin.News 6238, 6253, Congress included a statutory provision directing EPA to conduct a detailed study of mining wastes to evaluate "the potential danger to human health and environmental vitality." *Id.; see* § 8002(f), 42 U.S.C. § 6982(f). The study provision mandates investigation of the following factors: the sources and volume of mining waste and present disposal practices; alternative practices and costs of the alternatives; potential dangers to human health and the environment; possibilities for use of discarded material; and adequacy of state or other federal regulatory programs to meet the problem.

At the time Congress enacted this section, there was no provision in RCRA permitting the deferral of mining waste regulation until the study was complete. In

subsequent years, EPA attempted to develop a regulatory approach to various types of mining wastes. On December 18, 1978, EPA proposed regulations governing hazardous waste under which mining wastes from the "extraction, beneficiation, and processing of ores and minerals" would be subject to distinct management standards as "special wastes," defined as low hazard wastes generated "in very large volumes." *See* 43 Fed.Reg. 58,946 (1978). On May 19, 1980, EPA revised its regulations to eliminate the separate category of "special wastes" subject to modified Subtitle C regulation. The agency explained that, due to tightening of its EP toxicity and corrosivity criteria for Subtitle C regulation, the agency anticipated that "special" large volume/low hazard wastes would no longer qualify for stringent regulation under Subtitle C. *See* 45 Fed.Reg. 33,174 (1980). However, certain smelting and refining mining waste streams satisfying the revised criteria for hazard were "listed" under Subtitle C.

Just before these interim final regulations went into effect, Congress changed the approach to regulation of mining waste. On October 21, 1980, Congress passed the Solid Waste Disposal Act of 1980 (Pub.L. 96–482, 94 Stat. 2334), adding to RCRA new sections known as the "Bevill Amendment." Under new § 8002(p), 42 U.S.C. § 6982(p), Congress expanded the scope of EPA's study of mining industry wastes. In addition to factors listed in § 8002(f), this section directs the EPA to "conduct a detailed and comprehensive study on the adverse effects on human health and the environment, if any, of the disposal and utilization" of these wastes and to investigate any "documented cases in which danger to human health or the environment has been proved." § 8002(p)(4). In addition to analyzing alternative disposal methods, their cost, and their impact on the cost of mining products, *see* § 8002(f), (p), EPA was ordered to investigate the impact of alternative disposal methods on the utilization of the nation's natural resources. § 8002(p)(7), (8). The Bevill Amendment also included § 3001(b)(3)(A)(ii),

which suspended regulation of mining processing wastes under Subtitle C until at least six months after the agency had completed and submitted this study to Congress. Congress also added § 3001(b)(3)(C), 42 U.S.C. § 6921(b)(3)(C), which orders EPA to make a regulatory determination with regard to wastes excluded from Subtitle C regulation. Within six months after submission of the study, and following public opportunity for comment, this section requires EPA "either * * * to promulgate regulations under [Subtitle C] for each waste * * * or determine that such regulations are unwarranted."

The agency missed the October 16, 1983 statutory deadline for completion of the § 8002(p) study, and an environmental group brought suit to enforce EPA's responsibilities. In 1985, a district court ordered EPA to complete the § 8002(p) study of wastes suspended from Subtitle C regulation under the Bevill Amendment by December 31, 1985. *See Concerned Citizens of Adamstown v. EPA,* Civ. No. 84–3041 (D.D.C. Aug. 21, 1985). Because EPA anticipated that certain smelting and refining wastes from advanced stages of ore processing would not fall within the Bevill exclusion as interpreted in regulations the agency intended to propose, the agency did not plan to submit a study concerning those wastes. (In a companion case, another panel of this court addresses, among other things, EPA's failure to either study or regulate those wastes under Subtitle C in a timely fashion. *See Environmental Defense Fund and Hazardous Waste Treatment Council v. EPA and Lee M. Thomas, Administrator,* 852 F.2d 1316 (D.C.Cir.1988)). However, EPA promised to study large quantity primary processing wastes that the agency interpreted as falling within the Bevill exclusion.

C. Hazardous and Solid Waste Amendments of 1984

While EPA was conducting its § 8002(p) investigation, Congress enacted another provision addressing mining waste regula-

tion as part of the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), 42 U.S.C. §§ 6924(a)-(x). New § 3004(x) was designed to "provide[ ] that if certain mining wastes become subject to regulation as hazardous wastes the Administrator of the EPA will have the authority to modify the requirements of the Act." 130 Cong.Rec. S9180 (daily ed. July 25, 1984) (remarks of Sen. Simpson). This amendment allows the agency to alter enumerated Subtitle C requirements to take into account "the special characteristics of [mining] wastes, the practical difficulties associated with implementation of such requirements, and site-specific characteristics, including * * * climate [and] geology * * * so long as such modified requirements assure protection of human health and the environment." 42 U.S.C. § 6924(x).

D.  Report to Congress on Extraction and Beneficiation Wastes and EPA's Regulatory Determination

On December 31, 1985, EPA submitted a Report to Congress on mining wastes from the early processing stages of extraction and beneficiation. See Report to Congress on Wastes from the Extraction and Beneficiation of Metallic Ores, Phosphate Rock, Asbestos, Overburden from Uranium Mining, and Oil Shale ("Report"). The Report estimated that up to 755 million metric tons of waste produced yearly by the nonfuel mining industry potentially qualifies as hazardous. Report at ES–14. EPA also acknowledged that this figure was an overestimate because the conventional tests for one indicator of hazardousness—EP toxicity—do not reflect real conditions. A modified test to approximate realistic leaching conditions revealed that no mining waste samples tested were toxic. See id. at 4–22. The Report also discussed current waste managment practices and the economic costs of regulation of mining wastes under Subtitle C regulation scenarios of varying rigor. The Report estimated that a full Subtitle C regulatory approach would cost over $800 million per year—an amount that would force most mines to close. See id. at ES–19.

After receiving comments from the industry, EPA published its "regulatory determination" required by § 3001(b)(3)(C) on July 3, 1986. 51 Fed.Reg. 24,496 (1986). The agency announced its decision not to regulate under Subtitle C the wastes covered in the Report to Congress. The agency instead proposed to develop a regulatory program for these wastes under Subtitle D of RCRA. While noting the "lack of Federal oversight and enforcement authority over mining waste controls under Subtitle D," EPA vowed to "work with Congress" to develop an effective regulatory program under Subtitle D, and to obtain the necessary oversight and enforcement authority. 51 Fed.Reg. 24,501.

The agency explained its decision to exempt these wastes from Subtitle C regulation in terms of the factors it evaluated as part of the § 8002(p) study. While agreeing with commentators that it had overestimated in its original report the amount of technically hazardous waste, EPA also noted that mining wastes meeting the intrinsic criteria of hazardousness "generally have lower exposure and risk potential" than other industrial wastes. The agency found that most mining sites are removed from population centers, located in drier climates with minimal toxic leaching, and isolated from drinking water supplies, surface water, or other water supply receptors. See id. at 24,499–500.

The agency also discussed the overwhelming costs to the mining industry of full Subtitle C controls. The agency found that, in addition to being "unnecessary to protect human health and the environment," the stringent requirements of Subtitle C such as liner systems and closure and capping standards were "technically infeasible or economically impractical." Id. at 24,500. The capping and lining standards, in particular, would require construction of enormous and costly structures to contain large quantities of solid mining waste. EPA pointed out that less expensive techniques not suitable for more concentrated industrial waste—such as interceptor wells, cutoff walls, or selective use of liners and caps—would suffice to abate any danger from mining wastes. Id. The agency also

noted that some states had "comprehensive and well-integrated" mining waste regulatory programs already in place. EPA suggested that the Subtitle D option chosen by the agency would take into account state by state variation and avoid duplication of protection in states already well-regulated. *Id.* at 24,499.

While acknowledging that § 3004(x) of the HSWA of 1984 as well as § 3004(a) of RCRA provided some flexibility for waste-specific modification of Subtitle C, EPA rejected the option to tailor Subtitle C requirements in accordance with those amendments. EPA noted that the general authority to modify Subtitle C performance standards granted under § 3004(a) does not include the "flexibility to consider the economic impact of regulation" as allowed by the Bevill Amendment. EPA also rejected recourse to § 3004(x) because of uncertainty concerning EPA's freedom under that section to modify Subtitle C requirements and its burden of documentation to justify relaxation of standards. *Id.* at 24,500. The agency expressed its belief that it lacked sufficient information "to support specific modifications of multiple provisions in the existing hazardous waste regulations." EPA concluded that "Subtitle C does not provide an appropriate template for a mining waste management program." *Id.* at 24,501. However, the agency expressed its intention to continue its study of mining wastes and to use the additional information to flesh out a program under Subtitle D. EPA finally conceded that further study might reveal a need "to reconsider Subtitle C for certain mining wastes." *Id.*

## II. ANALYSIS

EDF contends that EPA's decision to exempt extraction and beneficiation mining wastes from Subtitle C requirements was arbitrary and capricious and contrary to the requirements of RCRA. It argues that Congress' main concern in adopting the Bevill Amendment was rectifying EPA's lack of information about the true hazards of mining wastes, not changing the criteria for regulation of wastes under Subtitle C.

According to EDF, the legislative history of the Bevill Amendment and the structure of Subtitle C make clear that Congress intended for EPA's regulatory determination to turn solely on whether the § 8002(p) study revealed that mining wastes are hazardous. As a further indication that Congress intended EPA to tailor Subtitle C rather than to exempt hazardous mining wastes from its requirements altogether, EDF points to the 1984 amendments to RCRA. It claims EPA acted arbitrarily in judging that this provision provided insufficient flexibility to apply Subtitle C management standards to mining wastes and in rejecting all possibilities for regulation under Subtitle C.

EPA counters that the statute and legislative history permit exemptions from Subtitle C regulation despite technical findings that some mining wastes qualify as hazardous. EPA points to the factors it was directed by Congress to study under § 8002(p) as an indication that Congress intended the agency to take into account economic considerations as well as the hazards of mining wastes. The agency defends its decision not to regulate under Subtitle C, but to develop a regulatory program under Subtitle D, as a reasoned exercise of the agency's discretion to consider all relevant factors in deciding whether regulation under Subtitle C is "unwarranted."

■ We think EPA's interpretation of the Bevill Amendment as allowing the agency discretion to base its regulatory determination on a variety of factors is a permissible construction of the statute and is not contrary to any clear expression of congressional intent. In reaching this conclusion, we begin by inquiring "whether Congress has directly spoken to the precise question at issue." *Chevron USA v. NRDC*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Although the statute directs EPA to base its determination on "information developed or accumulated pursuant to [the mining wastes] study," § 3001(b)(3)(C), it does not precisely address how the information is to be used by EPA in making a regulatory determina-

tion. Thus Congress did not expressly define the grounds for finding that regulation under Subtitle C is "unwarranted." Since the statute is "silent or ambiguous" concerning how EPA is to go about making its determination, this court must decide "whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2782; *see also NRDC v. Train,* 421 U.S. 60, 88, 95 S.Ct. 1470, 1486, 43 L.Ed.2d 731 (1975); *Chemical Mfrs. Ass'n v. EPA,* 673 F.2d 507, 511 (D.C.Cir.1982). In doing so, we look to the overall statutory structure as well as the measure's legislative history. Unless these indicia of intent rule out the agency's interpretation, we must respect the agency's construction.

We first note that the statutory language is fully consistent with EPA's understanding of Congress' intent to give the agency broad discretion to consider a number of factors. The statute clearly states that the agency is to base its regulatory determination on the information gathered for the § 8002(p) study. No provision of the Bevill Amendment assigns an absolute priority to any one factor, including hazardousness. If, as EDF contends, one criterion absolutely controls any determination to regulate under Subtitle C, the congressional provision for study of other factors makes little sense.

Moreover, EDF has cited no legislative history that definitively requires imposing Subtitle C regulation on all mining wastes within the Bevill exclusion that are found to be "hazardous" under the Subtitle C definition. Indeed, our reading of the statute and legislative history strongly suggests that Congress designed the Bevill Amendment to break with the previous approach to regulation of hazardous industrial wastes. With respect to ordinary industrial wastes, the structure of Subtitle C manifests a congressional assumption that these wastes, if found to be "hazardous" in accordance with the four intrinsic criteria of corrosivity, ignitability, EP toxicity, and reactivity, would also prove dangerous to health and environment. A finding of a hazardous characteristic was sufficient to trigger regulation. *See* 40 C.F.R. §§ 261.-

11(a)(1). While the § 8002(p) studies of mining wastes necessarily require an evaluation of hazardousness, the provisions mandating these studies nowhere mention "hazard." In § 8002, Congress asks EPA to investigate risk or danger to human health and environment—a context-specific concept. This evinces a congressional understanding that "hazardous" mining wastes might not prove dangerous. This understanding was most clearly expressed in the Conference Report discussing the later 1984 HSWA, § 3004(x):

> This amendment recognizes that even if some of the special study wastes are determined to be hazardous it may not be necessary or appropriate, because of their special characteristics or other factors, to subject such wastes to the same requirements that are applicable to other hazardous wastes, and that protection of human health and the environment does not necessarily imply the uniform application of requirements developed for disposal of other hazardous wastes.

H.R.Conf.Rep. No. 1133, 98th Cong., 2d Sess. 93, *reprinted in* 1984 U.S.Code Cong. & Admin.News, 5576, 5664.

The legislative history of the Bevill Amendment confirms that Congress eschewed a narrow technical approach to imposition of Subtitle C controls, choosing to evaluate the need for regulations by focussing on the actual dangers posed by mining wastes. Congressman Bevill's discussion of the Amendment is replete with references to "the degree of hazard *posed* by these wastes" and the need to develop "meaningful regulation to deal with the truly hazardous waste products *which threaten our communities * * * ."* 126 Cong.Rec. 3361 (Feb. 20, 1980) (remarks of Rep. Bevill) (emphasis added). The goal of the study of mining wastes was to "determine whether, if at all, these materials present any hazard *to human health or the environment." Id.* (emphasis added). These and other passages make plain that, despite his use of the term "hazard," Rep. Bevill was directing attention to the actual risk posed by the wastes. This approach is

clearly at odds with EDF's interpretation of the statute as mandating Subtitle C regulation upon a finding of hazardousness.

Additionally, we find it difficult to accept EDF's view that, because Subtitle C regulation of wastes found hazardous is mandatory, the statutory scheme of RCRA governing mining wastes forecloses a cost-benefit analysis. The § 8002(p) study provision lists cost as an independent factor. During the discussion of the Amendment, Rep. Bevill stated, "[t]hese studies would include evaluation of the economic and environmental aspects of existing and alternative disposal and reuse options. EPA would also be required to focus on the impact of these alternatives on the use of our coal and other natural resources." 126 Cong. Rec. 3361. These remarks confirm that Congress intended attention to cost and the economic impact of regulatory controls in making a regulatory determination. The emphasis on economic factors is consistent with Congress' obvious goal in enacting the Bevill Amendment—to relieve the mining industry of the onerous economic burden of stringent Subtitle C controls if at all possible. If EDF deems undesirable separate consideration of the cost of regulation, this objection should be addressed to Congress and not to this court.

EDF points out that although EPA was asked to evaluate cost in § 8002(f) prior to the enactment of the Bevill Amendment, the statute did not at that time exempt hazardous mining wastes from Subtitle C regulation. EDF argues that the validity of cost as a factor in the decision to regulate should therefore not be inferred from a mandate to study economic factors. This argument ignores the very different contexts of the § 8002(f) and § 8002(p) provisions for mining waste study. At the time Congress enacted RCRA, the § 8002(f) inquiry was indeed a theoretical exercise, since Congress had no immediate plans to use the information to modify the *status quo*. Section 8002(p), on the other hand, directed a study to be used to make a specific regulatory determination. The inference that the factors to be investigated and considered as part of the § 8002(p) study are *all* relevant to EPA's ultimate decision whether or not to impose Subtitle C requirements is a reasonable reading of the statute.

■ We also decline to interpret the 1984 amendments as requiring the EPA to tailor Subtitle C requirements in accordance with § 3004(x) or § 3004(a). We fail to see how Congress' choice to make Subtitle C more flexible manifests a clear congressional intention to retroactively narrow the discretion conferred on EPA by the Bevill Amendment. Section 3004(x) provided EPA an additional regulatory option *in the event that* the agency chose to regulate under Subtitle C. It did not affect EPA's prerogative to reject that option if inappropriate.

Contrary to EDF's implication, EPA is not obligated to promulgate regulatory programs EDF or this court judges preferable as long as the option chosen is permissible under the statute as written and justified by "consider[ation of] relevant factors and articulat[ion of] a rational connection between the facts found and the choice made." *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983) (citations omitted). While Subtitle C regulation was clearly among EPA's possible choices, we do not think the statutory language or the 1984 amendments abrogate EPA's complete discretion to choose among possibilities—including regulation under Subtitle D—that might prove satisfactory in light of the agency's findings. In fact, the agency articulated a number of plausible reasons for its decision not to avail itself of the flexibility to modify Subtitle C requirements under § 3004. These reasons suffice to support EPA's conclusion that the option to regulate under a modified Subtitle C program is too cumbersome and uncertain to accommodate the agency's goals. However, as long as the Subtitle D plan was not in itself *unreasonable,* the possible feasibility of alternatives under Subtitle C would not warrant an order by this court imposing Subtitle C regulation.

In sum, there is little to support EDF's restrictive reading of the RCRA provisions

governing regulation of mining wastes, and much to favor EPA's approach. Furthermore, the court "need not find that [the agency's interpretation] is the only permissible construction that EPA might have adopted, but only that EPA's understanding of this complex statute is a sufficiently rational one to preclude a court from substituting its judgment for that of EPA." *Chemical Mfrs. Ass'n v. NRDC*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985) (citations omitted). Since we are obliged to defer to EPA's reading of its organic statute unless clearly contrary to congressional intent, we decline to overturn the agency's regulatory approach in this case.

While we do not hold unreasonable EPA's initial decision to develop a regulatory scheme under Subtitle D, we recognize that we cannot fully evaluate at this juncture the adequacy of EPA's mining waste regulatory program. Our decision today does not license the agency to ignore safety or relieve the agency from its duty to effectuate the underlying purpose of the RCRA provisions governing mining wastes —protection of health and environment in a cost effective manner. While EPA has a great deal of leeway in fashioning the contours of its program, the agency's final regulations will be subject to scrutiny when finally promulgated and in place. At this point, however, we do not find that EPA has taken unreasonable action in its determination to regulate extraction and beneficiation wastes under Subtitle D.

*Affirmed.*