UNITED STATES of America, Plaintiff,

v.

IRON MOUNTAIN MINES, INC., et al., Defendants.

STATE OF CALIFORNIA, Plaintiff,

v.

IRON MOUNTAIN MINES, INC., et al., Defendants.

Civ. Nos. S-91-768 MLS, S-91-1167 MLS.

United States District Court, E.D. California.

Sept. 21, 1992.

Memorandum Denying Reconsideration Jan. 20, 1993.

David B. Glazer, U.S. Dept. of Justice, Environmental & Natural Resources Div., Michael B. Hingerty, U.S. E.P.A., San Francisco, CA, Yoshinori H.T. Himel, Asst.

U.S. Atty., U.S. Attorney's Office, Sacramento, CA, for plaintiff U.S.

Paul B. Galvani, Ropes and Gray, Boston, MA, Thomas G. Redmon, Matthew W. Powell, Wilke, Fleury, Hofelt, Gould & Birney, Sacramento, CA, for defendant Rhône–Poulenc Basic Chemicals Co.

Bruce H. Jackson, Edward S. Atkinson, Jr., Baker & McKenzie, San Francisco, CA, for defendant T.W. Arman and Iron Mountain Mines, Inc.

## MEMORANDUM AND ORDER

MILTON L. SCHWARTZ, District Judge.

These consolidated cost recovery actions arise under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. § 9601 *et seq.* The actions concern Iron Mountain Mine, a parcel of land northwest of Redding, California, that for 100 years was mined for iron, zinc, copper, silver, gold, and pyrite ores. According to plaintiffs, intensive mining has fractured the land, causing severe acid mine drainage ("AMD") that poses a threat to the environment.

### I. Procedural Background.

On August 11, 1992, the court heard plaintiff United States of America's motion for partial summary judgment on defenses, plaintiff State of California's motion to strike defenses of defendant Rhône–Poulenc Basic Chemicals Co. ("RP"), and plaintiff State of California's motion to strike defenses of defendants Iron Mountain Mines, Inc., and T.W. Arman ("IMMI/Arman"). David B. Glazer appeared on behalf of plaintiff United States, Lisa Trankley Sato appeared on behalf of plaintiff State of California, Paul B. Galvani appeared on behalf of defendant RP, and Edward S. Atkinson appeared on behalf of defendants IMMI/Arman.

The defenses subject to plaintiffs' motions are enumerated below as they are enumerated in defendants' answers and each defense is fully described in the text of this memorandum. For convenience, the defenses are cited herein as follows: for example, "RP1–US" denotes the first defense of defendant Rhône–Poulenc Basic Chemicals Co. in the United States case; "IMMI5–CA" denotes the fifth defense of defendants Iron Mountain Mines, Inc., and T.W. Arman in the California case. Rulings on the motions as to particular defenses employ the same citation form.

One procedural nicety must be mentioned. Although California moves to strike particular defenses (*see* Fed.R.Civ.P. 12(f)), the United States seeks summary adjudication of many of the same defenses (*see* Fed.R.Civ.P. 56). The United States has also joined in California's motion to strike. Both motions raise similar or identical legal issues and, with some exceptions, are directed to the same defenses. Some defenses may be appropriately stricken as to both plaintiffs. But, because California has not sought summary adjudication, summary judgment will not be awarded in California's favor on any defense.

### II. Substantive Background.

Plaintiffs' motions arise from CERCLA's scheme of quasi-strict liability. *See, e.g., United States v. Aceto Agric. Chems. Corp.,* 872 F.2d 1373, 1377 (8th Cir.1989) ("Most courts have held CERCLA imposes strict liability"); *United States v. Monsanto Co.,* 858 F.2d 160, 167 (4th Cir.1988) ("We agree with the overwhelming body of precedent that has interpreted section 107(a) as establishing a strict liability scheme"), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 732 n. 3 (8th Cir.1986) (*"NEPACCO"*) ("Most cases have imposed strict liability"), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). CERCLA section 107(a)(4)(A) holds certain persons liable for "all costs of removal or remedial action incurred by the United States government or a State" so long as those costs are "not inconsistent with the national contingency plan ["NCP"]." 42 U.S.C. § 9607(a)(4)(A). Persons liable include "the owner and operator

of a vessel or a facility" and "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(1) and (2). The first sentence of section 107 states that CERCLA liability is "subject only to the defenses set forth in subsection (b) of this section." *Id.* Only three defenses are listed in section 107(b): (1) "act of God"; (2) "act of war"; and (3) "act or omission of a third party other than an employee or agent of the defendant...." 42 U.S.C. § 9607(b). A fourth provision states that "any combination of the foregoing" defenses will also establish no liability.

### III. Standards of Review.

A. Summary Judgment under Rule 56.

■ Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate when the moving party shows that "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Jung v. F.M.C. Corp.,* 755 F.2d 708, 710 (9th Cir.1985).

In summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* at 324, 106 S.Ct. at 2553. Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. at 2553.

■ If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue of material fact actually exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). In attempting to establish that a factual dispute exists, the opposing party may not rely upon its pleading denials, but must tender evidence of specific facts in the form of affidavits or admissible discovery material, or both, in support of its contention that a dispute exists. Rule 56(e); *Matsushita, supra,* 475 U.S. at 586–87, 106 S.Ct. at 1356. The opposing party must demonstrate that the fact in contention is material, *i.e.,* a fact that might affect the outcome of the suit under the governing law and that the dispute is genuine, *i.e.,* the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

B. Motion to Strike under Rule 12(f).

■ Federal Rule of Civil Procedure 12(f) provides that, on motion of either party or of the court, the court may order stricken from any pleading any insufficient defense. While a party's motion to strike must be made before the party files a responsive pleading, the court acting on its own initiative may order material stricken

at any time. Thus, where the motion to strike is untimely, the court may yet strike an insufficient defense. 5A C. Wright and A. Miller, *Federal Practice and Procedure* § 1380 (2d ed. 1990).

■ "All well-pleaded facts are taken as admitted on a motion to strike." *Kelly v. Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959). The motion to strike helps avoid a waste of resources by eliminating spurious issues before trial. *Sidney v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir.1983). However, the motion is not favored by courts because it is thought to be dilatory. *United States v. 416.81 Acres of Land*, 514 F.2d 627, 631 (7th Cir.1975). As to insufficient defenses, the prevailing view is that the district court has broad power and can strike any insufficient defense, including constitutional ones. *Id.* at 630 n. 3. However, a motion to strike an affirmative defense should only be granted if the affirmative defense is insufficient as a matter of law. *See Memorex Corp. v. International Business Mach. Corp.*, 555 F.2d 1379 (9th Cir.1977).

*IV. Analysis.*

Because of the breadth of plaintiffs' motions, the following analysis is largely organized by topic.

A. Has Plaintiff Stated a Claim under CERCLA?

Plaintiff United States first moves for summary judgment on RP1–US and IMMI1–US, in which defendants assert that plaintiff has failed to state a claim upon which relief can be granted. Plaintiff California moves to strike IMMI1–CA, which alleges that California has also failed to state a claim for relief.

Each plaintiff's complaint endeavors to state a single claim for relief seeking recovery of past and future response costs under CERCLA section 107, 42 U.S.C. § 9607. Plaintiffs premise defendant RP's liability on its alleged status as successor in interest to liabilities of Mountain Copper,

Ltd., who is said to have mined the site for several decades. Defendants IMMI/Arman's liability is premised on their alleged status as present owner of the site.

The Ninth Circuit Court of Appeals has written that

> To state a claim under 42 U.S.C. § 9607(a) [*i.e.*, a CERCLA cost recovery claim], a plaintiff must allege that (1) the waste disposal site is a "facility" within the meaning of 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, *id.* § 9607(a)(4); and (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that are "consistent with the national contingency plan," *id.* §§ 9607(a)(4) & (a)(4)(B). [Citations.] In addition, the defendant must fall within one of four classes of persons subject to CERCLA's liability provisions:
>
> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of.... 42 U.S.C. § 9607(a)(1)–(4).

*Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152–1153 (9th Cir.1989).

■ The familiar defense of failure to state a claim "test[s] the formal sufficiency of the statement of the claim for relief; it is not a procedure for resolving a contest about the facts or the merits of the case." 5A *Federal Practice and Procedure, supra* § 1356. The defense must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.*

There is no real question that plaintiffs have stated formally sufficient claims for relief under the applicable law.[1] Plaintiff United States' complaint alleges (1) that the "site is a 'facility' within the meaning of Section 101(9) of CERCLA" (U.S. Compl.

---

1. IMMI/Arman so concede in their opposition to the United States' motion. IMMI Opp. (U.S.) at 10:21–23.

at ¶ 25); (2) that defendants IMMI/Arman are current owners or operators of the mine (*id.* at ¶ 26); (3) that defendant RP owned or operated the mine "during the time in which hazardous substances were disposed of" (*id.* at ¶ 27); (4) that the substances disposed of "are 'hazardous substances' within the meaning of Section 101(14)" (*id.* at ¶ 28); (5) that " 'releases' or 'threatened releases' of hazardous substances at or from the site" have occurred (*id.* at ¶ 29); (6) that "[t]he releases or threatened releases ... have caused the United States to incur ... 'response' costs within the meaning of Section 101(25) of CERCLA" (*id.* at ¶ 30); (7) that each defendant is a person liable under section 107 (*id.* at ¶ 31); (8) that such persons are liable for all removal and remedial costs not inconsistent with the NCP (*id.* at ¶ 32); and (9) that costs incurred were not inconsistent with the NCP (*id.* at ¶ 33). This pleading exceeds the requirements imposed by the Ninth Circuit in *Ascon Properties, supra,* 866 F.2d at 1152–1153. Plaintiff California's pleading is similarly complete. Accordingly, plaintiffs' motions regarding RP1–US, IMMI1–US, and IMMI1–CA will be granted.

Defendant RP also insists that relief cannot be granted on plaintiffs' claims for four separate reasons listed in RP2–US and RP2–CA. Each reason is considered immediately below. Defendants IMMI/Arman join in that section of RP's opposition assailing the availability of relief. The United States has moved for summary judgment on all four of the issues raised in RP2–US and California has moved to strike three of the four allegations made in RP2–CA.

1. *Releases "at" Rather than "from" a Facility.*

■ Plaintiffs' complaints allege that hazardous substances have been released "at or from" Iron Mountain Mine. According to RP, the usage "at or from" expands CERCLA's reach, which is limited to cases where wastes have been released or threaten to be released "from" a facility. Thus, in RP1–US, RP2–US, and RP2–CA, RP alleges that the complaint fails to state a claim insofar as plaintiff seeks to recover costs for responding to a release "at" property now owned by IMMI/Arman near Redding, California.

Cases such as *Ascon Properties, supra,* repeat the statutory language regarding facilities *"from which* there is a release" or threatened release, suggesting that, to be liable, a person must own or have owned or operated a facility *from* which a hazardous substance has been or threatens to be released. 42 U.S.C. § 9607(a) (emphasis added). The question to be answered here is whether a release "at" a facility—meaning a release that never leaves the facility—is a covered release.

Plaintiffs argue that CERCLA section 104(a), 42 U.S.C. § 9604(a)(1), which gives the President authority to remedy any release of wastes "into the environment," should be read in conjunction with section 101(8), 42 U.S.C. § 9601(8), which defines "environment" as (in part) "surface water, ground water, ... land surface or subsurface strata ... within the United States...." Such a reading, say plaintiffs, establishes liability for releases at a facility so long as the facility itself fits the statutory definition of environment.

RP complains that such a result would impose liability even if acidic water never left the mountain because the mountain itself constitutes land or subsurface strata. RP Opp. (U.S.) at 11:12–15. RP relies on *Fertilizer Inst. v. United States E.P.A.,* 935 F.2d 1303 (D.C.Cir.1991), which concerns an EPA reporting regulation promulgated under CERCLA section 102(a). The regulation defined a release as "placement of a hazardous substance into any unenclosed containment ... wherein the" substance "is exposed to the environment." *Id.* at 1307. In rejecting the regulation the court held that the regulation "cannot be reconciled with CERCLA's express terms [that define] a release as the movement of a substance from a facility *into the environment...."* *Id.* Rather, the EPA regulation reached substances that were merely *"exposed to the environment." Id.*

*Fertilizer Institute,* while it draws a nice and probably correct distinction, does not respond to the argument that "environment" as defined by CERCLA may include the facility itself. *Fertilizer Institute* was concerned only with a regulation that had potential to reach harmful substances that, although stored in open containers, had never reached and may never reach the environment as defined at section 101(8). Moreover, the CERCLA provision construed in *Fertilizer Institute* did not cover threatened releases, while section 107(a) does.

It has been more plainly held that release of hazardous wastes at a facility are sufficient to trigger section 107 liability for costs. *See United States v. Mottolo,* 695 F.Supp. 615, 623 (D.N.H.1988) (hazardous chemicals dumped onto site surface constitute releases or threatened releases within the meaning of CERCLA). *Mottolo* also notes that there is no requirement under CERCLA that off-site pollution occur. *Id.*

More important, the liability provision plaintiffs seek to apply to RP indicates that RP may be held liable for a release *at* rather than *from* the facility. RP's liability is premised on its status as successor to the liabilities of Mountain Copper, Ltd., who is said to have mined Iron Mountain. Assuming RP may be held to answer for Mountain Copper, its liability rests on section 107(a)(2), which states that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" shall be liable.

Accordingly, summary judgment should be granted in plaintiff United States' favor on RP1–US and RP2–US to the extent that those defenses pose a question whether a release or threatened release "at" a facility is within the scope of section 107(a). For the same reasons, the same assertion in RP2–CA should be stricken as to plaintiff California.

2. *Exclusion of Mining Wastes from "Hazardous Wastes" under CERC-LA.*

In the second part of RP2–US and RP2–CA, RP contends that plaintiff has stated no claim warranting relief because mining wastes are excluded from CERCLA's definition of hazardous substances. Plaintiff United States seeks summary judgment on RP2–US and plaintiff California seeks to strike identical language in RP2–CA.

CERCLA section 101(14) defines hazardous substances at length.[2] Subdivision (C) of section 101(14) purports to exclude from CERCLA solid wastes that are not now federally regulated.[3] Plaintiffs insist that the subdivision (C) mining waste exclusion does not preclude CERCLA coverage of a waste if the constituents of that waste are described in any other part of section 101(14).

The background of the mining exclusion is as follows. In 1976, Congress enacted the Resource Conservation and Recovery Act ("RCRA"), which amended the Solid Waste Disposal Act ("SWDA"). 42 U.S.C. § 6901 *et seq.* Subtitle C of RCRA covers

---

**2.** Section 101(14) states:

"hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C. § 6901 *et seq.*] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C. § 7412], and (F) any immi-

nently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

**3.** The operative language is, "but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Congress."

hazardous wastes and subtitle D of RCRA covers non-hazardous wastes. Section 3001(b)(1) of RCRA requires EPA to identify wastes that, because they are hazardous, are subject to regulation under subtitle C. 42 U.S.C. 6921(b)(1). In 1978, EPA proposed that "special wastes," which it defined as high-volume, low-toxicity wastes, be subject to fewer regulations. 43 Fed.Reg. 58,946 (1978). Among wastes that EPA classified as "special" were mining wastes, *i.e.*, wastes from "extraction, beneficiation, and processing of ores and minerals." 43 Fed.Reg. 59,016 (1978). But when in 1980 EPA issued final regulations identifying hazardous wastes under RCRA, it failed to separate "special wastes" for lesser regulation. 45 Fed.Reg. 33,066 (1980). Before EPA's final regulations took effect, Congress enacted the Solid Waste Disposal Act Amendments of 1980, Pub.L. No. 96–482, 94 Stat. 2334, known as the Bevill Amendment. The Bevill Amendment suspended RCRA regulation of "solid wastes from the extraction, beneficiation, and processing of ores and minerals" until at least six months after EPA completed a comprehensive study of the adverse effects of these low-hazard, high-volume wastes. 42 U.S.C. § 6921(b)(3)(A)(ii). In 1980, Congress also enacted CERCLA, incorporating the Bevill Amendment mining waste exclusion in CERCLA's definition of hazardous substances. *See* 42 U.S.C. § 9601(14)(C).

Between 1980 and 1986, EPA proposed several interpretations of the scope of the Bevill Amendment. In a 1986 regulation, EPA exempted extraction and beneficiation wastes from RCRA. 51 Fed.Reg. 24, 496 (1986); *also see Environmental Defense*

*Fund v. U.S. Environmental Protection Agency [sic]*, 852 F.2d 1309, 1312 (D.C.Cir. 1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). Such wastes, more precisely defined, are "[s]olid waste from the extraction of ores and minerals consisting of very large volumes of overburden and waste rock excavated during mining [and] [s]olid waste from the beneficiation of ores and minerals including large volumes of crushed rock tailings." *Environmental Defense Fund v. Environmental Protection Agency*, 852 F.2d 1316, 1327 (D.C.Cir.1988), *cert. denied sub nom., American Mining Cong. v. Environmental Defense Fund*, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). EPA did not immediately decide which particular wastes would be excluded under the Bevill Amendment.

In 1988, the District of Columbia Circuit Court of Appeals held that Congress intended the Bevill Amendment exclusion "to encapsulate the 'special waste' concept articulated by EPA in 1978," meaning that all wastes of high volume and low toxicity would be excluded from regulation under subtitle C of RCRA. *Environmental Defense Fund, supra,* 852 F.2d at 1329. The court also imposed a deadline on EPA to determine which particular processing wastes would fall within the Bevill Amendment exclusion. *Id.* at 1331. By September 1989, EPA produced final exclusion criteria and began to evaluate particular processing wastes to determine which qualified for exclusion. The final list of excluded mining wastes is found at 40 C.F.R. 261.4(b)(7) (1990).[4]

---

4. The wastes excluded under 40 C.F.R. 261.-4(b)(7) are:
 (1) slag from primary copper processing;
 (2) slag from primary lead processing;
 (3) red and brown muds from bauxite refining;
 (4) phosphogypsum from phosphoric acid production;
 (5) slag from elemental phosphorus production;
 (6) gassifier ash from coal gasification;
 (7) process wastewater from coal gasification;
 (8) calcium sulfate wastewater treatment plant sludge from primary copper processing;
 (9) slag tailings from primary copper processing;

 (10) fluorogypsum from hydrofluoric acid production;
 (11) process wastewater from hydrofluoric acid production;
 (12) air pollution control dust/sludge from iron blast furnaces;
 (13) iron blast furnace slag;
 (14) treated residue from roasting/leaching of chrome ore;
 (15) process wastewater from primary magnesium processing by anhydrous process;
 (16) process wastewater from phosphoric acid production;
 (17) basic oxygen furnace and open hearth furnace air pollution control dust/sludge from carbon steel production;

Several courts have considered the question whether mining wastes excluded from RCRA regulation by the Bevill Amendment may be regulated under CERCLA notwithstanding the exclusionary reference in section 101(14)(C). The leading case is *Eagle-Picher Indus. v. United States E.P.A.*, 759 F.2d 922 (D.C.Cir.1985), which held that section 101(14) limits the exclusion to wastes defined solely by subdivision (C), *i.e.*, by SWDA. *Id.* at 928. Thus, under *Eagle-Picher*, a substance may be regulated under CERCLA if it falls within another subdivision of section 101(14) although it may be a Bevill Amendment waste excluded by subdivision (C). *Id.* at 930. The court reasoned that Congress, had it intended the exclusion to apply throughout section 101(14), would have placed the exclusion at the end of the section as was done with the exclusion for petroleum and natural gas. *Id.* at 927. Several district courts have also held that the mining waste exclusion applies only to those wastes defined solely by subdivision (C) and not by other subdivisions of section 101(14). *See United States v. Metate Asbestos*, 584 F.Supp. 1143, 1147 (D.Ariz.1984); *Idaho v. Bunker Hill Co.*, 635 F.Supp. 665, 673 (D.Idaho 1986); *Idaho v. Hanna Mining Co.*, 699 F.Supp. 827, 833 (D.Idaho 1987).

RP contends that *Eagle-Picher*'s reasoning is flawed. *Eagle-Picher*'s reliance on placement of the exclusion within subdivision (C) rather than at the end of subsection 14 conflicts with a sounder explanation for that placement. Each subdivision of 101(14) defines hazardous substances by reference to other environmental statutes. *See* n. 2, *supra*. Subdivision (C) incorporates those wastes defined by SWDA section 3001. Because SWDA section 3001 itself contains the Bevill Amendment exclusion, subdivision (C) of CERCLA section 101(14) is the rational place to include that exclusion.

The legislative history of CERCLA is instructive given the parties' conflicting interpretations of the meaning and scope of the mining waste exclusion. RP relies on a Senate Report (also cited in *Eagle-Picher*) that states:

It should be noted that any substance or material for which regulation is specifically suspended by Act of Congress under the Solid Waste Disposal Act is excluded from designation as a hazardous substance for the purpose of S. 1480, notwithstanding the presence in such substance of any hazardous or toxic chemical.

S.Rep. 848, 96th Cong., 2d Sess. 28 (1980). Although *Eagle-Picher* acknowledged that this language purports to establish that the mining waste exclusion applies without regard to the other wastes defined in section 101(14), the court nevertheless viewed congressional intent as unclear because the exclusion fell within subdivision (C) rather than at the end of section 101(14). 759 F.2d at 928–29. Because the language of the Senate Report conflicted with the plain meaning of the statute itself, said the court, the statute would control. *Id.* at 928–929.

In this court's view, *Eagle-Picher* misreads the statute. First, to give effect to the exclusion in section 101(14)(C), the statute must be read to exclude all Bevill Amendment wastes from CERCLA regulation. It is " 'an elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.' " *Mountain States Tel. & Tel. v. Pueblo of Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985), quoting *Colautti v. Franklin*, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979). Second, placement of the exclusion within subdivision (C) is sensible in that all SWDA wastes are defined in that subdivision. Third, to effectuate the exclusion regardless of its placement in the statute comports with clear legislative history.

Plaintiff United States argues that by enacting SARA in 1986 and thereby reauthorizing CERCLA, Congress made clear

(18) basic oxygen furnace and open hearth furnace slag from carbon steel production; (19) chloride process waste solids from titanium tetrachloride production; and

(20) slag from primary zinc processing.

that it approved *Eagle–Picher* and that it agreed that CERCLA applied to cleaning of mining waste sites in the same manner as it applied to other hazardous waste sites. Plaintiff notes that one goal of CERCLA reauthorization was to clean Iron Mountain Mine. 132 Cong.Rec. H9628 (daily ed. Oct. 8, 1986) (letter from L. Thomas, Admin. of EPA, to Sen. Stafford and Cong. Dingell). Plaintiff also notes that Congress did not adopt an amendment limiting EPA regulation of mining wastes.

■ Plaintiff's arguments do not consider the limited nature of the Bevill Amendment exclusion. Nothing in plaintiff's arguments shows that Congress believed *all* mining wastes to be regulated by CERCLA or whether it merely recognized that non-Bevill Amendment wastes may be regulated. The plain meaning of section 101(14) suggests that only wastes not excluded by the Bevill Amendment or by some other exclusion may be regulated by CERCLA. In this court's view, even if mining wastes are covered by CERCLA, certain wastes are excluded from coverage by reference to the Bevill Amendment in section 101(14)(C).

■ Having decided that Bevill Amendment wastes are excluded from coverage even though they may fall within other parts of section 101(14), the next question is whether the particular waste at issue here—AMD—is among those excluded by the amendment. The parties have not raised or briefed this question. Rather, plaintiffs ask either to strike, or for summary judgment on, the defense that they have not stated claims because mining wastes are specifically excluded from the definition of hazardous substances. In fact, the Bevill Amendment excludes only "special" mining wastes defined at 40 C.F.R. 261.4(b)(7), *see* n. 4, *infra*. Not all mining wastes are excluded by the regulation.

As a matter of law, plaintiffs' motions must be denied. While it appears that plaintiff United States is entitled to a rul-

ing in its favor on the question whether mining wastes *generally* are excluded under CERCLA, it also appears that *some* mining wastes are excluded, namely those found at 40 C.F.R. 261.4(b)(7). It cannot be decided on the present record that the part of RP2–US and RP2–CA pertaining to exclusion of mining wastes is insufficient.

3. *Liability for Releases Permitted by Federal Law.*

RP asserts in RP2–US that plaintiff United States' complaint also fails to state a claim to the extent that plaintiff seeks to recover response costs resulting from federally permitted releases; a similar allegation is made in RP12–US, which asserts that, because releases that may have occurred when RP's predecessors owned the mine were federally permitted, plaintiff cannot recover under section 107 of CERCLA.[5] Plaintiff United States moves for summary judgment as to both defenses, asserting that they are legally insufficient.

Section 107(j) provides that "[r]ecovery ... for response costs ... resulting from a federally permitted release shall be pursuant to existing law in lieu of this section." 42 U.S.C. § 9607(j). One such permitted release may arise under section 402 of the Clean Water Act, which authorizes issuance of a permit to discharge pollutants under the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. § 1342. Plaintiff acknowledges that from 1978 to 1983 an NPDES permit governed discharge of metals from two copper cementation plants at Iron Mountain.

■ Under CERCLA, costs of responding to a federally permitted release may not be recovered unless it is shown that non-federally permitted releases contributed to the natural injury. *See In re Acushnet River & New Bedford Harbor*, 722 F.Supp. 893, 897 (D.Mass.1989). While *Acushnet* suggests that plaintiffs have the burden to prove that non-permitted releases contributed to the harm, *id.*, it places on

---

**5.** Both allegations are also made in RP's answer to California's complaint but are not a subject of California's motions to strike.

defendants the burden to prove that the injury is divisible, *id.* at 897 n. 9, so that the award of response costs may be reduced to reflect the unrecoverable portion attributable to a permitted release. Even where releases may have been permitted, response costs may be recovered for any releases that (1) were not expressly permitted, (2) exceeded the limitations of the permit, or (3) occurred at a time when there was no permit. *Idaho v. Bunker Hill,* 635 F.Supp. 665, 673–74 (D.Idaho 1986).

■■■ Plaintiff insists that flows covered by the 1978–1983 permit represent only a portion of AMD flows at the site. Plaintiff submits evidence that "a large percentage of metals released into the environment at the site come from waste rock piles, tailings piles, seeps and sediments. These metals-bearing flows are not treated in the copper cementation plants operated at the sites." Decl. of R. Sugarek at ¶ 12. Plaintiff also submits evidence that all flows since 1983 have been unpermitted, decl. of J. Pedri at ¶¶ 6 and 8; that permits were limited to copper loading; and that full compliance with the permits was never achieved, *id.* at ¶¶ 6–7.

RP does not address the question whether nonpermitted releases contributed to the alleged injury; instead, RP argues that plaintiff has not met its burden to produce evidence that the harm is divisible. Plaintiff replies that, even if the burden of production is properly plaintiff's, that burden is satisfied by its evidence that only some releases were permitted. Plaintiff is correct: evidence that some wastes were not treated in the permit-covered cementation plant and that post–1983 releases were not permitted is sufficient to suggest that nonpermitted releases contributed to the harm.

■■■ More important, that a release may have been federally permitted does not alone prevent recovery of response costs. Recovery is prevented only where defendant proves that the injury is divisible. *Acushnet* places the burden to prove divisibility on defendant RP, who has offered no evidence to establish that the injury alleged by plaintiff may be attributed in measurable proportion to permitted releases. RP

thus fails to sufficiently establish an essential element of its defense: divisibility of the injury. *See Celotex v. Catrett, supra,* 477 U.S. at 322, 106 S.Ct. at 2552. Accordingly, summary judgment is appropriately awarded in plaintiff United States' favor on that part of RP2–US alleging that the United States has stated no claim to the extent that it seeks to recover for permitted releases. The same result holds as to RP12–US, which alleges that releases that may have occurred during ownership by RP's predecessors were federally permitted.

### 4. *Whether Mining Constitutes "Disposal" under CERCLA.*

■■■ In the fourth part of RP2–US and RP2–CA, RP alleges that plaintiffs fail to state a claim for relief because mining, including the creation of tailings piles, does not constitute disposal within the meaning of CERCLA. The United States moves for summary judgment on this defense and California moves to strike it, both plaintiffs asserting that discharge of AMD and abandonment of tailings constitute disposal under CERCLA.

CERCLA defines disposal by reference to SWDA section 1004, codified at 42 U.S.C. § 6903. 42 U.S.C. § 9601(29). Under SWDA,

"disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters.

42 U.S.C. § 6903(3). Plaintiff United States offers evidence that ore extraction at the mine has fractured mineralized zones, allowing formation of AMD that is discharged through the watersheds into Spring Creek Dam and the Sacramento River. Decl. of R. Sugarek at ¶¶ 6–8, 11. Plaintiff also submits evidence that heavy metals leach from tailings piles that were created during mining. *Id.* at ¶ 12. Plaintiff contends that discharge of AMD and

abandonment of tailings constitute disposal under CERCLA.

Opposing summary judgment, RP first insists that only disposal of solid or hazardous waste, rather than disposal of hazardous substances, can subject it to CERCLA liability, citing *3550 Stevens Creek Ass'n v. Barclays Bank*, 915 F.2d 1355, 1361 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). *Stevens Creek*, which refused to allow cost recovery for removal of asbestos-laden building materials on grounds that the materials were not solid or hazardous wastes, draws a fine distinction in the statutory scheme. First, it notes that liability under CERCLA depends on occurrence of "a 'release' or 'threatened release' of a hazardous substance...." *Id.* at 1359; 42 U.S.C. § 9607(a)(4). Second, it notes that a CERCLA "defendant must be a person 'who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of.'" *Id.;* 42 U.S.C. § 9607(a)(2). Third, it notes that the action constituting "disposal of any hazardous substance" must involve "any solid waste or hazardous waste...." *Id.* at 1361; 42 U.S.C. § 9601(29) and 42 U.S.C. § 6903. Thus, "[o]n its face, 'disposal' pertains to 'solid waste or hazardous waste,' not to building materials which are neither." *Id.* Having established that a covered disposal must involve waste, RP narrows its argument, insisting that because CERCLA incorporates the RCRA definition of hazardous waste but not its definition of solid waste, *see* 42 U.S.C. § 9601(14), a disposal of solid mining wastes is not a disposal within the meaning of CERCLA.

In fact, the *Stevens Creek* court read CERCLA to reach disposal of either solid or hazardous waste, not hazardous waste alone. 915 F.2d at 1361. So does the statute: the SWDA definition of disposal,

incorporated in CERCLA at section 101(29) (42 U.S.C. § 9601(29)), defines a disposal of "solid waste or hazardous waste." RP's conclusion that disposal under CERCLA pertains only to hazardous wastes is a leap not supported by the statute.

RP does not otherwise dispute that "discharge" of AMD from the mine constitutes a "disposal" under CERCLA. For this reason alone, summary judgment must go to plaintiff on the assertion in RP2–US that mining does not constitute disposal. For the same reason, the same allegation in RP2–CA is insufficient and plaintiff California's motion to strike it will be granted.

## B. Failure to Mitigate Damages and Recovery of "Unnecessary" Costs.

Plaintiff United States moves for summary judgment on RP4–US, which alleges that plaintiff failed to mitigate its damages. The United States also moves for summary adjudication of RP3–US, RP13–US, and RP18–US; in each of these, defendant denies that it is liable for "unnecessary" response costs.[6] Plaintiff California moves to strike the same defenses, which are numbered RP3–CA, RP4–CA, RP13–CA, and RP18–CA.

Under section 107, a person who is liable under CERCLA (e.g., because a hazardous waste was released, or threatens to be released, from a facility the person owns or operates) is liable for "all costs of removal or remedial action incurred by the United States Government or a State ,... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(1)–(4)(A). Where "any other person" than the United States, a State, or an Indian tribe incurs costs, a CERCLA defendant is liable for "any other *necessary* costs...." 42 U.S.C. § 9607(a)(1)–(4)(B).

■ Because the statute provides that all costs may be recovered, courts have rejected the defense of failure to mitigate

---

**6.** In RP3–US, RP denies that it is liable for "costs that are unnecessary or inconsistent with the National Contingency Plan ["NCP"]...." In RP13–US, RP asserts that, if it is liable for any response costs, "it is liable only for ... costs that are necessary and not inconsistent with the" NCP. In RP18–US, RP merely "denies" the

elements of plaintiff's case, one of which they describe as follows: that "response costs were necessary...." The discussion in this section deals generally with the question whether costs must have been necessary in order to be recovered.

damages. "CERCLA does not impose a duty upon the Government to mitigate response costs." *United States v. Kramer,* 757 F.Supp. 397, 420 (D.N.J.1991); *Kelley v. Thomas Solvent Co.,* 714 F.Supp. 1439, 1451 (W.D.Mich.1989) (section 107 "imposes no duty upon the United States to mitigate costs," so defense "is insufficient as a matter of law and will be stricken"); *United States v. Marisol, Inc.,* 725 F.Supp. 833 (M.D.Pa.1989) (striking failure to mitigate damages defense).

Opposing such a rule, RP cites *United States v. Hardage,* 116 F.R.D. 460, 466 (W.D.Okla.1987), which refused to strike the failure-to-mitigate defense in light of potential delay and misfeasance by the government. In the instant case, RP neither suggests nor offers evidence of misfeasance or delay. In other words, defendant gives no persuasive reason to maintain an otherwise insufficient defense. Accordingly, plaintiffs' motions relative to the failure to mitigate defenses (RP4–US and RP4–CA) will be granted.

■ As to recovery of unnecessary costs, governments have generally been allowed to recover all response costs, as is permitted by the statute. *See United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1504 (6th Cir.1989) (government entitled to recover "indirect" or overhead costs, although costs were higher than other entities might have incurred), *cert. denied,* 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990); *United States v. Bell Petroleum Servs., Inc.,* 734 F.Supp. 771, 780–781 (W.D.Tex.1990) (costs need not be shown to be "reasonable and necessary"); *United States v. Hardage,* 733 F.Supp. 1424, 1432 (W.D.Okl.1989) ("[c]ourts have emphasized that liability extends to *ALL* response costs").

For the above reasons, plaintiff United States' motion for summary judgment should be granted on RP3–US, RP13–US, and RP18–US to the extent that those defenses deny liability for unnecessary response costs.[7] Similar defenses in the Cali-

fornia case—RP3–CA, RP13–CA, and RP18–CA—should be stricken to the same extent.

## C. Constitutional Defenses.

Numerous constitutional issues are raised by RP5–US and RP5–CA, which allege that imposition of CERCLA liability violates the due process, equal protection, taking, and ex post facto clauses of the United States Constitution. RP13–US and RP13–CA allege that the remedy selection process (*i.e.,* the process of determining responses necessary to releases or potential releases of hazardous substances) violates the due process and equal protection clauses. These defenses are subjects of the United States' motion for summary judgment and of California's motion to strike.

### 1. *Deprivation of Procedural Due Process in Remedy Selection.*

■ RP13–US and RP13–CA allege in part that RP was denied due process in the selection of remedies to be used at Iron Mountain Mine. In opposition to plaintiffs' motions, RP argues that it was denied an opportunity to examine witnesses and that it was also denied an opportunity to have remedy selection issues resolved by an impartial decision-maker.

The same contentions were considered at the June 12, 1992, hearing on the United States' motion to limit review of remedy selection to the administrative record. In an order dated June 19, 1992, the court stated that it "is satisfied that the informal remedy selection hearing process in which the administrative record is made (*see* 42 U.S.C. § 9613(k)) comports with due process, as does section 113(j) [42 U.S.C. § 9613(j)]. *See United States v. Rohm & Haas Co., Inc.,* 669 F.Supp. 672, 680 (D.N.J.1987)." The court also rejected RP's argument regarding partiality of the remedy-selection decision maker:

Nor does the court believe, as defendants argue, that EPA must erect an impartial

---

7. The United States has not asked for summary judgment on these defenses to the extent that they allege nonliability for costs inconsistent

with the NCP. Section 107(a) provides that a liable person is not liable for response costs inconsistent with the NCP. 42 U.S.C. § 9607(a).

tribunal to consider challenges to its remedy selections. First, the court recognizes that administrative agencies " ' "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." ' " *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*, 435 U.S. 519, 524 [98 S.Ct. 1197, 1202, 55 L.Ed.2d 460] (1978). Second, nothing in EPA's remedy selection process suggests the kind of personal interest or bias condemned in the due process cases.

The June 19 order requires that RP's due process challenge to the remedy selection process be rejected. Accordingly, summary judgment should be granted in the United States' favor on RP13–US to the extent that the defense alleges a due process violation; in the California case, RP13–CA should be stricken to the same extent.

### 2. *Deprivation of Substantive Due Process.*

 RP insists in RP5–US and RP5–CA that CERCLA deprives it of substantive due process in that the statute may lead to imposition of substantial retroactive monetary liability "on a corporate entity that neither was 'responsible' for, 'created,' nor 'profited from' releases from the Iron Mountain superfund site." RP Opp. (U.S.) at 38:20–39:1.

The burden to overcome the presumption that federal legislative acts are constitutional is RP's: " 'legislative acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality,' " so that " 'the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.' " *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984), quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). Where legislation operates retroactively, the retroactive aspects must themselves meet the test of due process. *Id.*

467 U.S. at 730, 104 S.Ct. at 2718. "But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Id.*

The retroactive reach of CERCLA has been explained as follows:

Although CERCLA does not expressly provide for retroactivity, it is manifestly clear that Congress intended CERCLA to have retroactive effect. The language used in the key liability provision, ... 42 U.S.C. § 9607, refers to actions in the past tense: "any person who at the time of disposal of any hazardous substances owned or operated,". . . .

*NEPACCO, supra,* 810 F.2d at 732–733.

Courts "have held uniformly that retroactive operation [of CERCLA] survives the Supreme Court's tests for due process validity." *United States v. Monsanto Co.*, 858 F.2d 160, 174 (4th Cir.1988); *NEPACCO, supra,* 810 F.2d at 733 ("retroactive application of CERCLA does not violate due process").

RP argues that its due process rights are violated in that its alleged immediate predecessor, Stauffer Chemical Company, "had no connection with the mining activities at Iron Mountain and in no way profited from those activities . . . ." RP Opp. (U.S.) at 39 n. 42. While the argument is attractive, " 'the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.' " *Pension Benefit Guar. Corp., supra,* 467 U.S. at 729, 104 S.Ct. at 2717. RP makes no such showing. But, more important, RP's liability is not predicated on RP's or Stauffer's status as miner of the land; rather, liability is premised on RP's status as successor to the liabilities of the alleged miner, Mountain Copper, Ltd.

Because RP fails to overcome the presumption of constitutionality, its substantive due process challenge must be rejected and summary judgment granted in favor of plaintiff United States on that part of RP5–US alleging a substantive due process violation; RP5–CA will be stricken to the

same extent as to plaintiff State of California.

### 3. *Equal Protection as to Liability and Remedy Selection.*

RP has also pled equal protection challenges that, like the due process challenges, have two components. In RP13–US and RP13–CA, RP asserts that the remedy selection process violated its right to equal protection of the laws. In RP5–US and RP5–CA, RP asserts that imposition of CERCLA liability also violates the equal protection clause.

 Because RP does not assert membership in a suspect class, equal protection review is done under the rational basis test. *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313–314, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976). Regarding RP5–US and RP5–CA, RP asserts that statutory joint and several liability under CERCLA encourages selective prosecution of those who are best able to reimburse governments for response costs, *i.e.,* those who are wealthiest. But RP does not establish that such selectivity, if it occurs, is irrational.

 It has been held that CERCLA's "imposition of joint and several liability ... does not raise a constitutional equal protection issue and, even if it did, would not violate the constitutional standard requiring equal protection of the laws." *United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 214 (D.Mo.1985); *also see United States v. Kramer, supra,* 757 F.Supp. at 432. Because RP offers no persuasive reason to reject the quoted conclusion, plaintiffs' motions concerning RP5–US and RP5–CA will be granted to the extent that the defenses allege that CERCLA liability violates equal protection.

In its opposing memoranda, RP makes no effort to establish that its right to equal protection of the laws was violated in the remedy selection process. Accordingly, plaintiffs' motions regarding the equal protection issue raised in RP13–US and RP13–CA will also be granted.

### 4. *Ex Post Facto Law.*

 RP5–US and RP5–CA also allege that CERCLA violates the prohibition against ex post facto laws found in Article I, Section 9, of the United States Constitution. The defense has often been rejected. *See Monsanto, supra,* 858 F.2d at 174–175 (CERCLA, which "does not exact punishment," is not an ex post facto law); *United States v. Kramer, supra,* 757 F.Supp. at 431 (D.N.J.1991) ("[a]ll courts to have considered the issue have rejected" argument that CERCLA is penal and ex post facto). RP offers no persuasive reason to vary that conclusion. Rather, RP notes that the ex post facto clause has been applied analogically in civil cases. *See Ralis v. RFE/RL, Inc.,* 770 F.2d 1121 (D.C.Cir.1985); *Louis Vuitton S.A. v. Spencer Handbags Corp.,* 765 F.2d 966 (2d Cir.1985). But RP gives no reason for analogical application of the ex post facto clause to this case. The *Louis Vuitton* case notes that the ex post facto prohibition "generally applies to criminal statutes [but] may also be applied where the civil disabilities disguise criminal penalties." *Id.* at 972. Here, it can hardly be said that CERCLA's liability scheme, which limits liability to response costs incurred by the government, provides for imposition of criminal penalties.

Finally, in its opposition to the United States' motion, RP attempts *ex post facto* to recast its ex post facto challenge as a challenge under the excessive fines clause of the Eighth Amendment. Because a violation of the Eighth Amendment is not among the defenses pled by RP, the arguments need not be reached.

For the above reasons, RP's ex post facto challenge must also be rejected and summary judgment awarded to the United States on that part of RP5–US assailing CERCLA as an ex post facto law. The same part of RP5–CA must be stricken.

### 5. *Taking for Public Use without Just Compensation.*

 The last constitutional principle invoked in RP5–US and RP5–CA is the taking clause of the Fifth Amendment, which states that private property shall not be

taken for public use without payment of just compensation. RP asserts that CERCLA violates the clause. Again, the defense has been rejected. *NEPACCO, supra,* 810 F.2d at 734 (government's cleanup does not deprive property owner of any property interest); *Conservation Chemical, supra,* 619 F.Supp. at 215–217 ("[w]hat defendants have referred to as a 'taking' is, in reality, nothing more than an attempt to transform a substantive due process challenge of an economic regulation into a confiscation of defendant's property rights"); *United States v. Cannons Engineering Corp.,* 720 F.Supp. 1027 (D.Mass.1989), *aff'd,* 899 F.2d 79 (1st Cir.1990). RP cites no cases and makes no arguments to support a contrary conclusion. Accordingly, plaintiffs' motions concerning the allegations in RP5–US and RP5–CA that CERCLA will cause an unconstitutional taking will be granted.

### D. Equitable Defenses.

Plaintiff United States moves for summary judgment on RP's equitable defenses: RP6–US, which alleges that plaintiff is estopped to recover, and RP8–US, which alleges that plaintiff's hands are unclean. Each of these defenses rests on the allegation that incurring of response costs was caused by actions of the United States Bureau of Reclamation ("USBR"). California moves to strike similar defenses, RP6–CA and RP8–CA, in the California case. Plaintiffs also seek rulings on the merits of defendants IMMI/Arman's equitable defenses, IMMI11–US and IMMI11–CA, which allege that each plaintiff waived its right to recover.

Plaintiffs argue that equitable defenses are precluded by the limitation in section 107(a) to defenses listed in section 107(b). 42 U.S.C. § 9607. Section 107 specifies that CERCLA liability is "subject only to the defenses set forth in subsection (b) of this section." *Id.* Only three defenses are listed in section 107(b): (1) "act of God"; (2) "act of war"; and (3) "act or omission of a third party other than an employee or agent of the defendant...." *Id.* Plaintiffs argue that, because equitable defenses such as waiver, estoppel, and unclean hands are not section 107(b) defenses, they are not available to defeat CERCLA claims.

Courts are divided on the question whether equitable defenses are available in section 107 cases. A number of cases have allowed equitable defenses, reasoning that because the government in a cost recovery case seeks the equitable remedy of restitution defendants should not be barred from raising equitable defenses. *Conservation Chemical, supra,* 619 F.Supp. at 206; *Violet v. Picillo,* 648 F.Supp. 1283, 1294 (D.R.I.1986); *Mardan Corp. v. C.G.C. Music, Ltd.,* 600 F.Supp. 1049, 1056 n. 9 (D.Ariz.1984), *aff'd* 804 F.2d 1454 (9th Cir. 1986).

Other courts have reasoned that, because equitable concerns may be raised elsewhere under CERCLA (e.g., under section 113, which provides that a CERCLA defendant may seek contribution from other responsible parties during or after a section 107(a) action, 42 U.S.C. § 9613(f)(1)), the limitation of defenses expressed by section 107 should be observed. *United States v. Kramer, supra,* 757 F.Supp. at 427.

The Supreme Court has noted that "Congress may ... guide or control the exercise of" equitable discretion on "clear and valid legislative command." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 1803–04, 72 L.Ed.2d 91 (1982). Accordingly, courts have held that section 107(a), which states that CERCLA liability is "subject only to the defenses set forth" at section 107(b), is a valid restriction under *Romero–Barcelo. See United States v. Stringfellow,* 661 F.Supp. 1053, 1062 (C.D.Cal.1987); *Kramer, supra,* 757 F.Supp. at 425–428 (striking defenses of unclean hands, estoppel, waver, laches, and *in pari delicto* ).

Cases precluding equitable defenses are more persuasive than those allowing the defenses for the simple reason that the former comport with the statute while the latter do not. Additionally, the particular defenses at issue here—waiver, estoppel, and unclean hands—may not be asserted against sovereigns who act to protect the public welfare. *Stringfellow, supra,* 661 F.Supp. at 1062, citing *Chesa-*

*peake & Delaware Canal Co. v. United States*, 250 U.S. 123, 125, 39 S.Ct. 407, 407–08, 63 L.Ed. 889 (1919). For these reasons, RP's and IMMI/Arman's equitable defenses (RP6–US, RP8–US, IMMI11–US, RP6–CA, RP8–CA, RP11–CA) are insufficient and plaintiffs' motions will be granted.

### E. Other USBR Defenses.

In several additional defenses, defendants seek to place responsibility for the alleged environmental harm on USBR. In RP7–US and RP7–CA, RP claims that to hold it liable for USBR's actions violates due process and equal protection. In RP9–US and RP9–CA, RP claims that plaintiffs, through government dam-building, caused the injury and assumed the risk of the injury for which they now seek recovery. In IMMI17–US and IMMI17–CA, IMMI/Arman also claim that USBR caused plaintiffs' injuries.

■ Regarding RP7–US, plaintiff United States notes that CERCLA liability is joint and several so that one defendant may be held liable for actions of another. Plaintiff acknowledges that it, too, may be held liable under section 120(a), which states that "[e]ach department, agency, and instrumentality of the United States" is "subject to" CERCLA "in the same manner, and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607...." 42 U.S.C. § 9620(a)(1). But plaintiff sees no irrationality in holding RP jointly and severally liable for damage that may have been done by USBR. Nor does RP establish that joint and several liability is irrational and thus outside the parameters of due process and equal protection. Also, section 113 permits RP to seek contribution from other responsible parties during or after the section 107(a) action. 42 U.S.C. § 9613(f)(1). Thus, as a matter of law, no constitutional harm is done by holding RP liable for damage that may have been done by USBR where RP's own liability for injury is established. If RP is found to be liable under section 107, then it is liable for all the damage although it may not have caused the damage. Ac-cordingly, the defenses numbered RP7–US and RP7–CA are insufficient and plaintiffs' motions will be granted.

As to RP9–US, RP9–CA, IMMI17–US, and IMMI17–CA, which allege that USBR caused injury, both such defenses are subsumed in part by the third-party defense authorized by section 107(b)(3). *See* 42 U.S.C. § 9607(b)(3). While RP admits that its ninth defense simply buttresses its section 107(b)(3) defense, no buttressing is needed. Defendants IMMI/Arman state that they do not contest plaintiffs' motions relative to IMMI17–US and IMMI17–CA.

Section 107(b)(3) provides that "[t]here shall be no liability ... for a person otherwise liable who can establish ... that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by ... (3) an act or omission of a third party...." All defendants have pled the third-party defense: RP in RP10–US and RP10–CA, IMMI/Arman in IMMI5–US and IMMI5–CA. None of these defenses are subjects of plaintiffs' motions. To the extent that a release, if caused by USBR, was not caused solely by USBR, defendants are protected by section 113(f), which permits equitable contribution. 42 U.S.C. § 9613(f).

As to defenses RP9–US, RP9–CA, IMMI17–US, and IMMI17–CA, the United States' motion for summary judgment will be denied on grounds that judgment on these defenses is premature until the question of USBR's liability is addressed. The question is raised both by counterclaims filed by all defendants and by the third-party defense that all defendants have pled; the court wishes to avoid any potential argument that litigation of USBR's responsibility is precluded by the grant of summary judgment in the United States' favor on the USBR defenses.

■ On the other hand, RP9–US and RP9–CA, which allege assumption of risk, may be stricken as insufficient. Assumption of risk is not a valid defense to a CERCLA cost recovery action. *See United States v. Marisol, Inc.*, 725 F.Supp. 833, 839–840 (M.D.Pa.1989). Also, defendants IMMI/Arman have stated non-opposition to

the striking of IMMI12–US, IMMI12–CA, IMMI14–US, IMMI14–CA, IMMI17–US, IMMI17–CA, IMMI18–US, and IMMI18–CA, which they believe to be related to the third-party defenses (IMMI5–US and IMMI5–CA) that are not subjects of plaintiffs' motions. Accordingly, these defenses will be stricken as to both plaintiffs.

### F. Release of a Naturally–Occurring Substance.

■ Plaintiff United States moves for summary judgment on RP11–US, which alleges that RP is not liable for releases of naturally occurring substances because EPA lacks authority to respond to such a release.[8] The defense is premised on section 104(a)(3)(A), which says: "[t]he President shall not provide for a removal or remedial action ... in response to a release or threat of release ... of a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found...." 42 U.S.C. § 9604(a)(3).

Plaintiff admits that RP is not liable for the costs of responding to releases of naturally occurring substances but believes that the proposition does not apply in this case. Plaintiff submits evidence that AMD flowing from the mine, although it consists of naturally occurring substances, is not itself naturally occurring but rather was created by mining. Decl. of R. Sugarek at ¶¶ 6–10.[9] In opposition, RP argues that plaintiff misconstrues the statute, which "is not phrased in terms of the process by which the hazardous substances are released." RP Opp. (U.S.) at 60:13–16. The argument is confusing. If RP means to say that section 104 prohibits response to releases of natural substances, it is mistaken: the statute permits response to release of any natural substance released in altered form, or to release of a substance not altered by natural processes. RP also argues that mining, if it could cause harm, could merely expose more ore surface to natural weathering processes that combine with ore to create AMD. But it is not disputed that mining constitutes an artificial alteration rather than a naturally occurring process or phenomenon. To the extent that mining may have exposed more ore to weather, it may have non-naturally increased the amount of AMD released into the environment.

In *Mid–Valley Bank v. North Valley Bank*, 764 F.Supp. 1377 (E.D.Cal.1991), relied on by both parties, defendant offered evidence that metals found at the site were within natural or background levels; defendant argued that the metals were thus naturally occurring. Plaintiff, on the other hand, offered evidence that the metals exceeded background levels. Recognizing a dispute, the court denied summary judgment. That dispute concerned the material question whether a hazardous substance triggering liability had been released.

Here, defendant RP offers no evidence to dispute that AMD released from the mine exceeds natural levels. In fact, RP points to no evidence to show that any release to which EPA has responded is naturally occurring. Rather, RP's evidence merely establishes that discharge of AMD occurred before mining did. Decl. of L. Erickson at ¶ 11. Plaintiff, on the other hand, offers evidence that present AMD releases from the mine are extremely elevated and that they exceed California water quality standards. Supp. decl. of R. Sugarek at ¶¶ 9–10.

RP also argues that, even if EPA has authority to respond to releases at the mine, a disputed issue of fact exists regarding divisibility of harm. RP again relies on *In re Acushnet River & New Bedford Harbor, supra,* 722 F.Supp. at 897, which assigns to RP the burden to prove that the injury is divisible. *Id.* at 897 n. 9. But RP has offered no evidence to suggest, let alone establish, that any harm (*i.e.*, any release) is divisible. Accordingly, summary judgment should be granted in plain-

---

**8.** California has not moved to strike the identical defense, RP11–CA, in the California case.

**9.** Although RP states that Sugarek is incompetent to so declare, i.e., that he is not a qualified expert, RP has not moved to strike his declaration.

tiff's favor on RP11–US. While one may infer from RP's evidence that some AMD is naturally released from the mine, no evidence establishes that the proportion of that natural release may be measured so as to prevent or diminish liability on the grounds stated in the defense. Nor does RP's evidence that AMD naturally occurred before mining reasonably dispute plaintiff's evidence that the AMD releases to which it has responded are the product of mining, which does not naturally occur within the meaning of section 104. In other words, on the evidence offered, no reasonable jury could find in favor of RP on the question whether it is liable for naturally occurring substances because there is no evidence that natural flows of AMD, if any, occur in measurable amounts.

### G. Is a Mine a Covered "Facility"?

 Both plaintiffs seek rulings on RP's defenses (RP16–US and RP16–CA) alleging that a mine is not a covered facility under CERCLA. RP argues that, because mines were extensively regulated when CERCLA was enacted, "it was no accident that Congress did not specifically identify mines in § 101(9)(A) of CERCLA...." RP Opp. (U.S.) at 59:14–17. RP's argument is not supported by law. Section 101(9) defines "facility" as:

(A) any building, structure, installation, equipment, pipe or pipeline ..., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container ... or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or vessel.

42 U.S.C. § 9601(9). While RP is correct that Congress did not specifically identify mines in this provision, Congress also did not specifically identify factories, plants, laboratories, laundromats, warehouses, dumps, or quarries—any number of places from which hazardous wastes might be released. Section 101(9) both defines facility narrowly (to include wells, pits, ponds, impoundments, and ditches) and broadly (to include "any site ... where a hazardous substance has been deposited ..: or otherwise come to be located"). There is no real question that this broad language may reach both the parts and the whole of Iron Mountain Mine. Accordingly, the United States' motion for summary judgment on RP16–US should be granted, as should California's motion to strike RP16–CA.

### H. Covered Persons.

Plaintiff United States expends a page of argument concerning that part of RP18–US that denies plaintiff's ability to prove that RP is a person covered by section 107, 42 U.S.C. § 9607.[10] RP18–US merely denies the elements of plaintiff's case, which are not elsewhere denied by RP's answer. The United States does not in fact request summary judgment on the question whether RP is a covered person; rather, it admits that the question of coverage turns on proof that RP succeeded to the liabilities of Stauffer Chemical Company and of Mountain Copper, Ltd—a question not raised by the summary judgment motion. Accordingly, summary judgment is inappropriate on RP's denial that it is a covered person under CERCLA.

### I. Must Plaintiffs Prove that ARARs Were Exceeded?

 As noted, RP18–US and RP18–CA allege in part that plaintiffs cannot prove that releases to which they have responded or will respond exceed or will exceed certain levels or ARARs. RP's assertion

---

**10.** RP18–US and RP18–CA deny that plaintiffs can establish that (1) RP is a person covered by section 107(a); (2) the release (or threatened release) to which plaintiffs have responded (or will respond) exceeded (or will exceed) ARARs (*i.e.*, applicable or relevant and appropriate requirements); (3) any release has caused the incurring of response costs; (4) a release of hazardous substances that were disposed of during the period of RP's ownership or operation of the site or that RP arranged a disposal; and (5) that response costs were necessary and consistent with the NCP.

At section III.B. of this order, the court rejected RP's denial of liability for necessary costs. At section III.I, the court considers the second part of RP's denial, which pertains to the exceeding of ARARs. The court will not rule on any other part of RP18–US or RP18–CA.

arises from *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664 (5th Cir.1989), a private cost-recovery case in which the court ruled that a minimum level of hazard must be shown before it can be said that a release caused the incurring of response costs. *Id.* at 670–671. The minimum level justifying response is established by:

> any "legally applicable or relevant and appropriate ... requirement" ("ARAR"). [42 U.S.C.] § 9621(d)(2)(A). ARARs include "any standard, requirement, criteria, or limitation under any Federal environmental law" or any more stringent "State environmental or facility siting law."

*Id.*

The *Amoco* case has been severely criticized. Although it requires that a fixed amount of harm be shown to justify response, the court elsewhere states that "[t]he plain statutory language fails to impose any quantitative requirement on the term hazardous substance and we decline to imply that any is necessary." 889 F.2d at 669. In *United States v. Western Processing Co., Inc.,* 734 F.Supp. 930, 942 (W.D.Wash.1990), the court concluded "that *Amoco* should be confined to its facts, it being a single generator, single substance, private cost recovery action."

This court disagrees with *Amoco* to the extent that *Amoco* requires proof that hazardous releases exceed a required minimum. No such showing is required by the statute. *See* 42 U.S.C. § 9607(a). Accordingly, that portion of RP18–US and RP18–CA pertaining to ARARs is insufficient as a matter of law.

 Even if *Amoco* were accepted as a correct statement of the law, summary judgment is appropriate in the United States' favor on that part of RP18–US concerning ARARs. Assuming that plaintiff must establish that ARARs are exceeded, it does so by undisputed evidence that hazardous discharges from the mine exceed California minimum water quality standards, *see* decl. of J. Pedri at ¶ 11; supp. decl. of R. Sugarek at ¶ 9. *Amoco* itself holds that "a plaintiff who has incurred response costs meets the liability requirement as a matter of law if it is shown that *any* release violates ... *any* applicable state or federal standard...." 889 F.2d at 671.

### J. Prejudgment Interest.

Plaintiff United States next moves for summary judgment on RP19–US, which alleges that plaintiff has not satisfied the prerequisites for prejudgment interest. RP has withdrawn the defense (*see* RP Opp. (U.S.) at 7 n. 22) in the United States case.[11]

### K. Preenactment and Prelisting Response Costs.

 RP20–US asserts that plaintiff United States cannot recover costs it may have incurred before enactment of CERCLA and RP21–US asserts that plaintiff United States cannot recover costs incurred before listing of Iron Mountain Mine on the National Priorities List. Plaintiff United States insists that neither assertion is correct, citing cases holding that preenactment response costs are recoverable, *see NEPACCO, supra,* 810 F.2d at 734–737; *O'Neil v. Picillo,* 883 F.2d 176, 183 n. 12 (1st Cir.1989), *cert. denied sub nom., American Cyanamid Co. v. O'Neil,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990), and that listing on the NPL is not a prerequisite to CERCLA liability, *see United States v. Conservation Chem. Co., supra,* 619 F.Supp. at 207–208. Because the law defeats the assertion made in RP20–US (*i.e.,* because preenactment costs are recoverable), logic defeats the assertion made in RP21–US: if preenactment costs are recoverable, then prelisting costs must also be recoverable, for no listing was done until CERCLA was enacted. The United States' motion for summary judgment will be granted as to RP20–US and RP21–US.

### L. Defenses Conceded by IMMI/Arman.

The court now turns to defenses that are unique to defendants IMMI/Arman. Also

---

**11.** The same defense is pled in the California case but, because it is not a part of California's motion to strike, the court does not rule on viability of the defense as to plaintiff California.

discussed below is an additional defense raised by all defendants.

IMMI/Arman have elected to withdraw the following defenses, which will therefore be stricken: IMMI10–US and IMMI10–CA (some or all of IMMI/Arman's actions occurred before enactment of CERCLA and were lawful at the time they were taken); IMMI12–US and IMMI12–CA (third-party acts were a superseding cause of injury); IMMI13–US and IMMI13–CA (lack of notice and opportunity to cure); IMMI14–US and IMMI14–CA (California is responsible because it approved, established, and supervised the mine); IMMI17–US and IMMI17–CA (USBR is responsible), and IMMI18–US and IMMI18–CA (IMMI/Arman did not dispose of wastes). IMMI/Arman also do not contest plaintiff California's motion to strike IMMI15–CA, which alleges that plaintiff failed to select appropriate and cost-effective responses; in light of IMMI/Arman's concession, the defense will be stricken.

M. Recoupment and Setoff.

IMMI/Arman dispute plaintiffs' motions concerning IMMI16–US and IMMI16–CA, which assert that recovery of response costs should be reduced via recoupment or setoff to reflect damages to IMMI/Arman's equipment, facilities, and minerals that plaintiffs may have caused. Plaintiff United States insists that the claim is not a properly pled recoupment claim and that the claim does not fall within a recognized waiver of federal sovereign immunity.

 Recoupment at common law "described a claim that defendant could assert against plaintiff only if it arose from the same transaction as plaintiff's claim." 6 *Federal Practice and Procedure, supra* § 1401. Recoupment "was purely defensive in character and could be used only to defeat or diminish plaintiff's recovery; recoupment could not be the basis of affirmative relief." *Id.* " 'Set-off,' on the other hand, referred to a claim by defendant that was unrelated to plaintiff's claim" and that "permitted defendant to assert an affirmative claim for relief. But the utility of setoff was limited by the requirement that

the claim either be for a liquidated amount or arise out of a contract or judgment." *Id.* The difference between the two is today reflected in Federal Rule of Civil Procedure 13, which distinguishes between compulsory counterclaims (*i.e.,* those arising out of the same transaction or occurrence as plaintiff's claim) and permissive counterclaims (which originate in a separate transaction or occurrence). *See id.* "When the United States institutes an action, the defendant may assert only compulsory counterclaims." *Spawr v. United States,* 796 F.2d 279, 281 (9th Cir.1986).

 The United States construes the recoupment claim as seeking damages and argues that the claim is barred because it seeks relief of a different kind from that sought by plaintiffs. Plaintiffs seek response costs under CERCLA and the United States notes that an action to recover response costs is restitutionary. *See, e.g., NEPACCO, supra,* 810 F.2d at 749 ("[w]hen the government seeks recovery of its response costs under CERCLA ... it is in effect seeking equitable relief in the form of restitution"). Plaintiff relies on language in *Frederick v. United States,* 386 F.2d 481, 488 (5th Cir.1967), that recoupment does not extend to relief that is "affirmative" in the sense that it is "different in kind or nature [from] that sought by the government. ..." *Also see Spawr, supra,* 796 F.2d at 281 (Federal Tort Claims Act claim for damages could not be pled as counterclaim in suit under Export Administration Act, 50 U.S.C.App. § 2410, because it sought relief "of a different form or nature" from that sought by United States).

On this question, IMMI/Arman have the better argument. They note that other courts have rejected the narrow view that the recoupment claim must be identical to that sought by the government. *See Livera v. First Nat'l State Bank of New Jersey,* 879 F.2d 1186, 1195 (3d Cir.), *cert. denied sub nom., Livera v. United States Small Bus. Admin.,* 493 U.S. 937, 110 S.Ct. 332, 107 L.Ed.2d 322 (1989). Indeed, *Livera* notes that "[t]he Supreme Court has held that when the United States insti-

tutes an action, a defendant may assert by way of recoupment *any claim* arising out of the same transaction or occurrence as the original claim in order to reduce or defeat the government's recovery." *Id.* at 1195–1196; *also see* 6 *Federal Practice and Procedure, supra* § 1427.

The United States notes that a recoupment claim does not require waiver of sovereign immunity. *Frederick* states that "when the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment...." 386 F.2d at 488. "[B]ut the sovereign does not waive immunity as to claims which do not meet the 'same transaction or occurrence test' nor to claims of a different form or nature than that sought by it as plaintiff...." *Id.* The Ninth Circuit has also noted that recoupment "counterclaims, arising from the same transaction as the matter sued upon, are allowed when the government waives its sovereign immunity in suing a person." *United States v. Lockheed L–188 Aircraft,* 656 F.2d 390, 395 n. 11 (9th Cir.1979). But plaintiff argues that any other claim requires such a waiver. In its opposing briefs, IMMI/Arman do not endeavor to salvage the separate setoff claims made in IMMI16–US and IMMI16–CA.

Plaintiff United States also argues that a claim for tort damages does not arise from the same transaction or occurrence as the government's claim for response costs, relying on *United States v. Hardage,* 750 F.Supp. 1460, 1519 (W.D.Okl.1990) (factual finding that EPA negligence did not arise from same transaction as defendant's waste disposal). But "[c]ourts generally have agreed that [transaction or occurrence] should be interpreted liberally in order to further the general policies of the federal rules and carry out the philosophy of Rule 13(a)." 6 *Federal Practice and Procedure, supra* § 1410. "Thus, the 'transaction' test does not require the court to differentiate between opposing legal and equitable claims." *Id.* To the extent that IMMI/Arman's recoupment claim arises out of plaintiff United States' response actions, it is logically related to plaintiff's

claim for the costs of those actions, and thus arises from the same transaction or occurrence.

 Finally, plaintiff United States argues that, in light of section 107's restriction of defenses under CERCLA, recoupment must fail if considered a defense. The argument must be rejected: a defense that could serve as an independent counterclaim may be relabeled a counterclaim. 5 *Federal Practice and Procedure, supra,* § 1275.

Plaintiffs' motions regarding IMMI16–US and IMMI16–CA will be denied to the extent that they seek rulings on IMMI/Arman's recoupment claim. To the extent that the defenses seek setoff, they will be stricken because IMMI/Arman state that they are satisfied with only the recoupment claim and because IMMI/Arman have established no waiver of sovereign immunity. The defenses may stand to the extent that they seek recoupment.

### N. Must Defendants Have "Disposed" to Be Liable?

Plaintiffs seek rulings on RP15–US and RP15–CA and on IMMI18–US and IMMI18–CA. In the former, RP asserts that it did not dispose of wastes at the mine and that releases resulted from operation of natural forces. In the latter, IMMI/Arman state that any hazardous substances disposed of at the mine were not disposed of by IMMI/Arman. As noted above, IMMI/Arman concede that IMMI18–US and IMMI18–CA may be stricken.

 RP insists that it did not dispose of waste at the mine and that passive disposal does not give rise to liability under CERCLA. As to the first argument, plaintiffs' complaints predicate RP's liability on RP's status as successor in interest to Mountain Copper, who is said to have mined the land, thereby disposing under the statute. Under section 107(a)(2), "any person who at the time of disposal ... owned" a covered facility is liable. 42 U.S.C. § 9607(a)(2). As to the second, CERCLA liability is triggered by ownership or operation of the facility, not by responsibility for contamination. *Nurad,*

*Inc. v. W.E. Hooper & Sons Co.*, 966 F.2d 837, 846 (4th Cir.1992). *Also see Stanley Works v. Syndergeneral Corp.*, 781 F.Supp. 659, 662–664 (E.D.Cal.1990).

The defenses RP15–US, RP15–CA, IMMI18–US and IMMI18–CA will be stricken as to all defendants on grounds that they are insufficient. An additional ground to strike exists as to IMMI/Arman, who concede that the defense may be stricken.

### O. Additional Defenses Which are the Subject of California's Motion to Strike.

Three additional issues are raised only by California's motion to strike. Two concern defendants IMMI/Arman and the third concerns defendant RP.

#### 1. *Recoverability of Response Costs.*

In IMMI3–CA, which has no counterpart in the United States case, IMMI/Arman assert that costs incurred or to be incurred by plaintiff are not response costs recoverable within the meaning of CERCLA. Plaintiff, uncertain what IMMI/Arman allege, requests that the defense be stricken as vague.

 The defense is confusing because it conflicts with section 107, which permits the CERCLA plaintiff to recover all response costs consistent with the NCP, 42 U.S.C. § 9607(a). Thus, to the extent that plaintiff incurs response costs, all such costs are recoverable. On the other hand, the defense also seems to allege that some costs incurred by plaintiff are not recoverable because they are not response costs. Indeed, IMMI/Arman explain in their opposition that the defense is raised in order that they may challenge plaintiff's claim on grounds that plaintiff seeks recovery of costs that are not " 'costs of response' under the provisions of CERCLA." IMMI Opp. (Cal.) at 10:18–21. While the explanation may be what is meant, it does not conform to what is said in the defense.

Nevertheless, the court chooses to deny the motion to strike IMMI3–CA but notes that the defense will be limited to enable IMMI/Arman to challenge whether particular costs are response costs under section 107.

#### 2. *Propriety of Joint and Several Liability.*

 In IMMI9–CA, IMMI/Arman state that imposition of joint and several liability is inappropriate in this case because any harm that has been or will be suffered is divisible; they also state that their liability should be proportionate to their contribution to the alleged harm or danger in light of California's allegation that its claims result solely from acts or omissions of RP, RP's predecessors, and USBR. California moves to strike the defense on grounds that RP is jointly and severally liable where the environmental harm is indivisible.

California's motion raises a fact question that cannot be resolved on a motion to strike. The defense is otherwise valid: liability under CERCLA is joint and several only where the harm is indivisible. *See United States v. Monsanto, supra,* 858 F.2d at 171. IMMI/Arman must be allowed an opportunity to present proof that responsibility for the alleged injury may be apportioned. Accordingly, the motion to strike IMMI9–CA will be denied.

#### 3. *Presence of Releases Warranting Response.*

RP14–CA alleges that, despite any releases that may have occurred, hazardous substances have dispersed so that any incurring of response costs is unwarranted. California insists that language stating that any releases of hazardous substances do not warrant response costs should be stricken because the only permissible challenge to response costs is insufficiency with the NCP. *See* 42 U.S.C. § 9607(a). California misreads the defense, which simply denies that there is a present release. The court does not read the defense to assert that no release warrants costs. The motion to strike RP14–CA will be denied.

### V. *Conclusion.*

For the reasons stated above:

1. Plaintiff United States' motion for summary judgment is GRANTED as to the following defenses: RP1–US, RP2–US (parts 1, 3, and 4), RP3–US (regarding recoverability of necessary costs), RP4–US, RP5–US, RP6–US, RP7–US, RP8–US, RP11–US, RP12–US, RP13–US (regarding necessary costs and due process and equal protection violations), RP16–US, RP18–US (regarding necessary costs and the exceeding of ARARs), RP20–US, RP21–US, IMMI1–US, and IMMI11–US.

2. Plaintiff United States' motion for summary judgment is DENIED as to the following defenses: RP2–US (part 2), RP9–US, IMMI16–US, and IMMI17–US.

3. Plaintiff State of California's motion to strike is GRANTED as to the following defenses: RP2–CA (parts 1 and 4), RP3–CA (regarding necessary costs), RP4–CA, RP5–CA, RP6–CA, RP7–CA, RP8–CA, RP9–CA, RP11–CA, RP13–CA (regarding necessary costs and due process and equal protection violations), RP15–CA, RP16–CA, RP18–CA (regarding necessary costs and the exceeding of ARARs), IMMI1–CA, IMMI10–CA, IMMI11–CA, IMMI12–CA, IMMI13–CA, IMMI14–CA, IMMI15–CA, IMMI16–CA (as to setoff claim) IMMI17–CA, and IMMI18–CA.

4. Plaintiff State of California's motion to strike is DENIED as to the following defenses: RP2–CA (part 2), RP14–CA, IMMI3–CA, IMMI9–CA, and IMMI16–CA (as to recoupment claim).

5. Plaintiff United States having joined in plaintiff State of California's motion to strike, the following defenses are stricken as to plaintiff United States: RP9–US, RP15–US, RP19–US, IMMI10–US, IMMI12–US, IMMI13–US, IMMI14–US, IMMI15–US, IMMI16–US (as to setoff claim but not as to recoupment), IMMI17–US, and IMMI18–US.

## MEMORANDUM AND ORDER ON RECONSIDERATION

On September 21, 1992, the court issued an order that in part dealt with the question whether mining wastes are excluded from the definition of hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The court concluded that some but not all mining wastes are excluded from CERCLA's definition of hazardous substances, excluded substances being those listed by the Environmental Protection Agency ("EPA") as Bevill Amendment wastes. *See* 42 U.S.C. § 9601(14); 42 U.S.C. § 6921(b)(3)(A).

Plaintiffs now move for reconsideration of that portion of the order covering the mining waste or Bevill Amendment exclusion. Plaintiffs' motion was heard on November 20, 1992, the following persons appearing: David B. Glazer on behalf of plaintiff United States, Lisa Trankley Sato on behalf of plaintiff State of California, and Paul B. Galvani on behalf of defendant Rhône–Poulenc Basic Chemicals Co. ("RP").

## I. Factual and Procedural Background.

These consolidated CERCLA cost recovery actions concern Iron Mountain Mine, a parcel of land northwest of Redding, California, that for 100 years was mined for iron, zinc, copper, silver, gold, and pyrite ores. According to plaintiffs, intensive mining has fractured the land, causing severe acid mine drainage ("AMD") that poses a threat to the environment. AMD, which consists of sulfuric acid, cadmium, copper, and zinc, poses a threat to fish who live in waterways below the mine.

On August 11, 1992, the court heard plaintiff United States' motion for partial summary judgment on defenses pled by defendants RP, Iron Mountain Mines, Inc., and T.W. Arman. Plaintiff State of California's motions to strike many of the same defenses were also heard on August 11. On September 21 the court issued an order disposing of plaintiffs' motions. In the portion of its order relevant to the present inquiry, the court denied plaintiffs' motions as to the part of RP's second defense that alleged that plaintiffs had stated no claim warranting relief because "mining wastes" are excluded from CERCLA's definition of hazardous substances. *See United States*

*v. Iron Mountain Mines, Inc.* (Sept. 21, 1992), at 1537–40. The court concluded that the plain meaning of section 101(14), which defines hazardous wastes, is that only hazardous wastes not excluded by the Bevill Amendment or by some other exclusion may be the basis of a CERCLA cost recovery action. *Id.* at 1540. In so concluding, the court rejected the interpretation of section 101(14) found in *Eagle–Picher Indus. v. United States E.P.A.*, 759 F.2d 922 (D.C.Cir.1985).

The issue concerning the Bevill Amendment exclusion arises because a necessary predicate to liability for CERCLA response costs is the release or threatened release of a "hazardous substance" from a vessel, site, or facility. *See* 42 U.S.C. § 9607(a). The apparent purpose of RP's second defense is to establish that, because "mining wastes" are excluded from CERCLA's definition of hazardous substances, it may not be held liable for response costs. More precisely, RP alleges that plaintiffs have not stated a claim for which relief may be granted because without a release or threatened release of a hazardous substance there can be no response cost liability under CERCLA section 107.[1]

Plaintiffs' motion for reconsideration rests on an erroneous suggestion made in the September 21 Memorandum and Order that 40 C.F.R. 261.4(b)(7) is an exclusive list of Bevill Amendment wastes. In fact, the cited list includes only mineral processing wastes and does not represent the universe of Bevill Amendment wastes, which is much broader. Bevill Amendment wastes include "solid wastes from the extraction, beneficiation, and processing of ores and minerals, including phosphate rock and overburden from the mining of uranium ore." 42 U.S.C. § 6921(b)(3)(A)(ii). Plaintiffs believe that the court's misunderstanding of the scope of the Bevill Amendment led it to discount their arguments concerning the subsequent legislative history of the Superfund Amendments and Reauthorization Act of 1986 ("SARA") and its effect on CERCLA section 101(14).

## II. Standard of Review.

A motion for reconsideration of an order denying summary judgment is appropriately brought under Federal Rule of Civil Procedure 59(e). *Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir. 1985). Such motions must be served no later than 10 days after entry of judgment. Fed.R.Civ.P. 59(e). An untimely motion for reconsideration is construed as a motion based on Federal Rule of Civil Procedure 60(b). *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1463 n. 35 (9th Cir. 1992). Rule 60(b) provides in relevant part that:

> On motion and upon such terms as are just, the court may relieve a party ... from a final ... order ... for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b) ... or (6) any other reason justifying relief from the operation of the judgment.

Rule 60(b) motions are addressed to the court's discretion, the exercise of which may be guided by equitable principles. 11 C. Wright and A. Miller, *Federal Practice and Procedure* § 2857 at 157–158 (1973). But the Rule 60(b) procedure may not be used as a substitute for an appeal. *McCarthy v. Mayo*, 827 F.2d 1310, 1318 (9th Cir. 1987). While, ordinarily, a motion under Rule 60(b) may not be made unless the order to be reconsidered is a final ruling from which an appeal could have been taken, the court retains plenary power to afford relief from interlocutory orders and judgments "as justice requires" notwithstanding Rule 60(b). 7 *Moore's Federal Practice* § 60.20 at 60–170 (2d ed.1992).

## III. Analysis.

### A. Do Plaintiffs Meet the Standard for Reconsideration?

Plaintiffs rest their motion on Local Rule 230(k), which describes the local

---

1. The parties have not raised the question, which remains undecided, whether AMD, the waste that is the basis of these lawsuits, is a hazardous waste within the meaning of section 101(14) or a waste listed under the Bevill Amendment.

procedure governing applications for reconsideration. Because the Local Rules are only intended to supplement the Federal Rules of Civil Procedure and "shall be construed consistently with and subordinately to" the latter, *see* E.Dist. Local R. 100(b), plaintiffs, having sought reconsideration after expiration of the 10 day Rule 59(e) deadline, must satisfy the standards of Rule 60(b). Plaintiffs cannot proceed under Rule 60(b) because an order denying summary judgment is not a final and appealable order within the scope of the Rule. *See* 6 *Moore's Federal Practice*, § 54.40 at 54–247.

Plaintiffs must thus appeal to the court's plenary power to grant relief from an interlocutory order if the interests of justice so require. *See* Adv. Comm. Note to 1946 Amend. to Rule 60(b). In seeking reconsideration, plaintiffs allege that the court misunderstood the scope of the Bevill Amendment and therefore summarily rejected the argument that, notwithstanding the 1980 language of section 101(14), the 1986 legislative history of SARA demonstrates Congress' belief that wastes exempted by subdivision (C) (which cross-references the Bevill Amendment) can be "hazardous substances" under other subdivisions of section 101(14). In its September 21 Memorandum and Order, the court concluded that because the Bevill Amendment suspends regulation of only "special" mining wastes (*i.e.,* those high in volume and low in toxicity), only such special wastes are exempt from regulation as hazardous substances. Thus the court did not deem significant Congress' alleged recognition in 1986 that CERCLA covered mining wastes generally: the court explained that Congress's ostensible 1986 intent was consistent with the limited exclusion enacted six years earlier, reasoning that in 1986 Congress simply acknowledged that *some* mining wastes—those not listed under the Bevill Amendment—were covered by CERCLA. *See Iron Mountain Mines,* at 1539–40.

Plaintiffs now note that EPA has listed so many wastes under the Bevill Amendment that section 101(14)(C) as construed by the court excludes most if not all mining wastes from CERCLA's hazardous wastes definition. Thus, say plaintiffs, Congress' 1986 impression that mining wastes can be hazardous substances makes no sense unless Congress also believed section 101(14)(C) was properly interpreted by *Eagle–Picher* and by EPA itself.

The court is persuaded that reconsideration is justified on the grounds suggested by plaintiffs. The court has also independently determined that the exclusion issue merits a second look. First, the issue is important to the cases. At oral argument on its summary judgment motion on August 11, 1992, the United States itself suggested that dismissal or judgment for defendants would necessarily follow a determination that mining wastes are excluded from the section 101(14) definition of hazardous wastes. Second, plaintiffs note that the parties seriously disagree about the import of the court's ruling on the Bevill Amendment exclusion and its implications for the future of the cases. In order to assure that its decision on the question is the best it can make, the court revisits the Bevill Amendment issue below.

B. Are Bevill Amendment Wastes Hazardous Substances under CERCLA Section 101(14)?

Hazardous substances are defined at CERCLA section 101(14) as follows:

"hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. 6921] (*but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress*), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture

with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14) (emphasis added). The highlighted language purports to exclude, either wholly or in part, certain wastes from the definition of hazardous substances. Those wastes include certain mining wastes the regulation of which was suspended under the Solid Waste Disposal Act ("SWDA") in an amendment named for Rep. Bevill. *See* 42 U.S.C. § 6921(b)(3)(A).[2] Under the Bevill Amendment, which was enacted several months before enactment of CERCLA section 101(14), regulation of "solid waste from the extraction, beneficiation, and processing of ores and minerals" was suspended under the SWDA until at least six months after EPA has completed a comprehensive study of the adverse effects of those wastes. 42 U.S.C. § 6921(b)(3)(A)(ii).

The parties hotly dispute the scope of CERCLA's Bevill Amendment exclusion. On the one hand, plaintiffs rely on the interpretation made in *Eagle–Picher*, which held that the section 101(14)(C) Bevill Amendment exclusion is limited to wastes defined by the SWDA alone. 759 F.2d at 928. Under *Eagle–Picher*, an excluded substance may nevertheless be an included, hazardous one if it or its components qualify as a hazardous substance under a provision of section 101(14) other than subdivision (C). On the other hand, RP has argued, and this court has agreed, that *Eagle–Picher*'s interpretation is mistaken because it permits EPA to enter from other doors a room that subdivision (C) says may not be entered. The court also earlier concluded that *Eagle–Picher*'s interpretation conflicts with the legislative history of section 101(14).

### 1. *Plain Language of Section 101(14)(C).*

▮▮▮▮ In interpreting a statute, the court first looks to the language of the statute itself and then to its legislative history. *Funbus Systems, Inc. v. California Pub. Util. Comm'n*, 801 F.2d 1120, 1125–26 (9th Cir.1986). But before it can reach legislative history, the court must conclude that the plain language of the statute is ambiguous. *Hellon & Assoc., Inc. v. Phoenix Resort Corp.*, 958 F.2d 295, 297 (9th Cir.1992). "A statute, clear and unambiguous on its face, need not and cannot be interpreted by a court and only statutes which are of doubtful meaning are subject to the process of statutory interpretation." 2A Sutherland, *Statutory Construction* § 45.02 at 5 (5th ed.1992). Ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses. *Id.* But, as Sutherland wisely comments, a finding of ambiguity is often merely "the judge's own uninstructed and unrationalized impression" of the statute's meaning. *Id.* The fact that a statute has been interpreted differently by different courts is evidence that the statute is ambiguous and unclear. *Id.* at 46.04.

Here, this court's reading of section 101(14) as announced in its September 21 Memorandum and Order notably differs from the readings of other courts. *Compare Eagle–Picher*, 759 F.2d at 928; *United States v. Metate Asbestos Corp.*, 584 F.Supp. 1143, 1147 (D.Ariz.1984); *State of Idaho v. Hanna Mining Co.*, 699 F.Supp. 827, 833 (D.Id.1987), *aff'd on other grounds*, 882 F.2d 392 (9th Cir.1989) *with United States v. Iron Mountain Mines* (Sept. 21, 1992), at 1537–40. Others have reasonably recognized that section 101(14) is susceptible to different readings. *See* Memo. to W. Hedeman, Dir. of EPA Ofc. of

---

**2.** The SWDA was amended by both the Resource Conservation and Recovery Act of 1976 (RCRA) and by the Solid Waste Disposal Act Amendments of 1980. The latter Amendments included the provision known as the Bevill Amendment.

**1558**

Emergency and Remedial Response, from J. Freedman, Att'y for EPA Water and Solid Waste Div., *re* Recovery Under Superfund of Response Costs Expended in Response to Seepage from Abandoned Ore Mines, Jan. 11, 1982 ("1982 Freedman mem.") (discussing two possible interpretations of section 101(14)(C)); testimony of L. Thomas, Ass't Admin. of EPA, before House Subcomm. on Oversight and Investigation re Mining Waste Policy: Failure to Protect Public Health, May 2, 1983 ("1983 Mining Waste Subcomm. Rpt.") (noting "two possible legal interpretations of [section 101(14) ]; one in which mining wastes are hazardous constituents, and one in which they are not"). This conflict supports the conclusion that section 101(14) is ambiguous so that legislative history should be consulted to aid interpretation.

■ In its prior ruling, although it considered a part of the legislative history, the court also noted " ' "that a statute should be interpreted so as not to render one part inoperative." ' " *United States v. Iron Mountain Mines* (Sept. 21, 1992), at ——, quoting *Mountain States Tel. & Tel. v. Pueblo of Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985). It remains a fundamental canon of statutory construction that "the unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." 2A Sutherland, *Stautory Construction* § 45.12 at 61; *see also Beisler v. Comm'r of Internal Revenue*, 814 F.2d 1304, 1307 (9th Cir.1987). If a reading of section 101(14)(C) leads to an unreasonable conclusion, the court should disregard that conclusion in favor of a reasonable interpretation regardless of ambiguity or legislative history.

RP argues that plaintiffs' interpretation of section 101(14) would render the Bevill Amendment exclusion inoperative because virtually all Bevill Amendment wastes are otherwise hazardous. RP has offered substantial evidence to support its assertion that all Bevill Amendment wastes are otherwise hazardous. *See, e.g.,* 1983 Mining Waste Subcomm. Rep. ("most, if not all, mining wastes contain constituents which are considered hazardous under other statutes and may, therefore, be considered hazardous under CERCLA"); 1982 Freedman mem. at 4–5 ("most (if not all) wastes whose regulation have been suspended under [SWDA] contain constituents which are identified as toxic under the other statutes enumerated in section 101(14)"). In response, plaintiffs cite only one waste excluded by subdivision (C) that *might not* be regulable under other subdivisions: solid waste containing barium. Absent evidence that exempt wastes exist that cannot be elsewhere regulated, the Bevill Amendment exclusion indeed seems to be superfluous and a nullity, as RP argues.

■ The deficiency in RP's argument is that it asks the court to deem EPA's interpretation of subdivision (C) unreasonable in light of events that occurred after the provision was enacted, namely, EPA's listing of certain substances as Bevill Amendment wastes. Only after listing of wastes has it become apparent that, at most, one waste exists that is regulated solely under SWDA. Accordingly, it cannot be said that plaintiffs' reading of section 101(14) would have rendered the Bevill Amendment exclusion inoperative at the time the exclusion was enacted. The court cannot fairly deem an interpretation unreasonable when the circumstances that render that interpretation unreasonable occurred after enactment of the relevant provision. For that reason, it is necessary to consider the legislative history in order to determine the meaning and scope of the section 101(14)(C) exclusion.

*2. Legislative History.*

Plaintiffs argue that when Congress enacted SARA in 1986 it explicitly and implicitly ratified *Eagle-Picher*'s and EPA's interpretation of section 101(14)(C). They contend that the 1980 legislative history of CERCLA—the year in which section 101(14) was adopted—is unclear. Thus, plaintiffs conclude that statements made in

the 1986 legislative history of SARA—which amended CERCLA but not section 101(14)—control interpretation of section 101(14)(C). Plaintiffs argue alternatively that the 1980 CERCLA legislative history, if controlling, does not support RP's proposition that mining wastes exempted from section 101(14)(C) may not be regulated under other subdivisions of section 101(14).

RP answers that, because the intent of the enacting Congress controls, historical analysis must rest on Congress' intent in 1980 when it enacted section 101(14)(C). RP asserts that the 1980 Congress clearly intended that mining wastes exempted under section 101(14)(C) *not* be regulated under other subdivisions of section 101(14). RP argues alternatively that, if the 1986 intent controls, the legislative history of SARA does not support plaintiffs' contention that Congress ratified *Eagle–Picher*'s and EPA's interpretation of section 101(14)(C).

 Before it can assess the legislative history, the court must first determine whether Congress' 1980 intent or 1986 intent controls—assuming that they differ. In *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 759, 99 S.Ct. 2066, 2073, 60 L.Ed.2d 609 (1979), the Supreme Court held that evidence of the intent of a post-enactment Congress is insufficient to overcome clear and convincing evidence that the enacting Congress had a contrary intent, noting that "the intent of the Congress that enacted the [provision] controls" and that subsequent "legislative observations are in no sense part of the legislative history" of a statute. *Also see consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117–18, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980) ("views of a subsequent Congress form an extremely hazardous basis for inferring the intent of an earlier one"). In both the cited cases, the court gave little or no weight to congressional interpretation of an act when that interpretation accompanied an amendment to the act in question. *Also see Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977) ("views of members of a

later Congress, concerning different sections of Title VII … are entitled to little if any weight").

On the other hand, *Oscar Mayer* implies that post-enactment legislative history *may assist* interpretation of a statute if pre-enactment history does not provide clear and convincing evidence of congressional intent. Consistent with that implication, the Ninth Circuit Court of Appeals has held that, in light of CERCLA's sparse legislative history, the legislative history of SARA may shed light on CERCLA. *Wilshire Westwood Assocs. v. Atlantic Richfield Corp.*, 881 F.2d 801, 806 (9th Cir. 1989); *also see Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986) (given "aura of uncertainty" surrounding CERCLA history, proper to rely on SARA history to interpret CERCLA). Moreover, in *GTE Sylvania*, the Supreme Court itself considered post-enactment history, but concluded that the history was not persuasive of the point for which it was offered. *See* 447 U.S. at 119, 100 S.Ct. at 2061; *also see Montana Wilderness Ass'n v. United States Forest Serv.*, 655 F.2d 951, 957 (9th Cir.1981) (post-enactment history is persuasive where (1) contemporaneous history is ambiguous and (2) the later Congress "carefully considered the issue"), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

The above cases show that, while the legislative history of the enacting Congress' intent is generally entitled to controlling weight, subsequent legislative history may be entitled to some weight, depending on clarity of the enacting Congress' intent and persuasiveness of the subsequent history. Accordingly, this court's first task is to ask whether the 1980 legislative history of CERCLA clearly indicates Congress' intent at the time section 101(14) was enacted. If so, there is no need to consider the 1986 legislative history of SARA.

Plaintiffs argue that the 1980 CERCLA legislative history does not support RP's view that hazardous constituents of mining wastes exempted under subdivision (C) of

section 101(14) may not be regulated as hazardous substances under other subdivisions of section 101(14). Plaintiffs acknowledge that the following 1980 statement concerning CERCLA's definition of hazardous substances appears to contravene their position:

It should be noted that any substance or material for which regulation is specifically suspended by Act of Congress under the [SWDA] is excluded from designation as a hazardous substance for the purpose of S.1480 [the Senate version of CERCLA], notwithstanding the presence in such substance of any hazardous or toxic chemical.

Thus drilling muds and brines, which will have been excluded from regulation by the 1980 amendments to section 3001 of [SWDA], are not hazardous substances under S.1480.

S.Rep. No. 96–848, 96th Cong., 2d Sess. at 28 (Jul. 11, 1980) (Senate Committee on Environment and Public Works). Plaintiffs attempt to harmonize this passage, which the court cited in its September 21 ruling, with their interpretation of section 101(14)(C): they argue that the Committee meant that a waste which would be a hazardous substance under SWDA *alone* would not be a hazardous substance under section 101(14)(C) if regulation of that waste had been suspended by the Bevill Amendment. Plaintiffs say the passage is thus consistent with the conclusion that a waste or constituent may be a hazardous substance under other subdivisions of section 101(14) if the substance or constituent is designated as hazardous under other federal statutes, notwithstanding the SWDA exclusion.

Plaintiffs cite other portions of the Senate Committee Report to support their argument. Before the quoted passage, but in the same section concerning CERCLA's definition of hazardous substances, the Committee reported that:

substances listed as hazardous or toxic under certain other Federal laws are incorporated by reference and upon the date of enactment of this bill such substances become statutorily defined as hazardous substances for purposes of

this bill. And the release of any of them or any constituent of them invokes the ... response provisions and any costs of removal or remedial action or any damages are subject to the liability provisions of the bill....

*Id.* at 24. The Report then lists substances deemed hazardous under the Clean Water Act, stating that "[EPA] regulations must be referred to to determine the hazardous wastes and their constituents which are hazardous substances for purposes of S.1480. Any material listed as a hazardous waste or a hazardous constituent is a hazardous substance for purposes of S.1480...." *Id.* at 28.

Plaintiffs also note that the Senate had mining sites in mind when it passed S.1480. Plaintiffs cite floor debate in which Sen. Hart asked Sen. Stafford whether radium mining sites would be covered by section 101(14) of the bill. Sen. Stafford answered, "if the radium sites do not otherwise come within section 170 of the Atomic Energy Act, and are not specified under the Uranium Mill Tailings Act, they will be eligible for funding and remedial action, subject to other conditions of the bill." 126 Cong. Rec. S14767 (Nov. 20, 1980). Before passage of H.R. 7020, the House version of CERCLA, Rep. Schroeder also asked whether radium tailings would be covered by section 101(14). Rep. Florio answered, "if any one of the materials are covered under [RCRA] they would be eligible for funding." 126 Cong.Rec. H9436 (Sept. 23, 1980). For two reasons, these statements do not establish the proposition for which they are offered. First, mining sites and mining wastes are not coterminous. Section 101(14) does not define hazardous substances by reference to the places in which such substances may be found, but rather defines them by reference to statutes defining the substances themselves. Second, both statements acknowledge that coverage is conditioned on the terms of the relevant legislation, be it CERCLA or RCRA (as amended by the SWDA Amendments).

Finally, plaintiffs cite the 1980 legislative history of the Bevill Amendment itself to

support their reading of the 1980 legislative history of CERCLA section 101(14). In offering his amendment during debate on the SWDA Amendments, Rep. Bevill stated that:

> numerous existing Federal and State programs under regulatory authorities other than RCRA, assure that the disposal of [Bevill wastes] will not go unregulated.... [W]hile this amendment will place a moratorium on regulation of these wastes under RCRA, it cannot be said that it would allow unregulated use of a potentially dangerous material. It will not exempt disposal of these materials from regulatory programs under these other statutes.

136 Cong.Rec. 3361–62 (Feb. 20, 1980). Plaintiffs thus argue that the legislative histories of both CERCLA and the SWDA Amendments support the conclusion that Bevill-exempt wastes may nevertheless be regulated as hazardous substances under other subdivisions of section 101(14).

RP answers that the history of neither statute supports plaintiffs' view. RP points out that the quoted comments from page 24 of the Senate Committee Report on CERCLA precede the page 28 caveat that subdivision (C) exempts certain substances from coverage notwithstanding the presence in such substance of any hazardous or toxic chemical. Thus, says RP, the quoted comments confirm that the 1980 Congress, while it knew that wastes excluded by subdivision (C) had hazardous constituents, chose to exclude those wastes from section 101(14) despite the hazards. RP also notes that the quoted Bevill Amendment history merely means that regulation of wastes under federal statutes *other than* CERCLA would continue while Bevill Amendment wastes were excluded under RCRA.

RP's interpretation of the 1980 history is more plausible than plaintiffs' reading, which stretches the meaning of the Committee's language. In the page 28 passage concerning the subdivision (C) exclusion, the Committee plainly states that Bevill-exempted wastes would not be CERCLA hazardous substances notwithstanding the presence in those wastes of hazardous or toxic chemicals. The statement does not *invalidate* plaintiffs' position because, as plaintiffs argue, it is possible to harmonize the passage with the idea that only wastes regulable solely under SWDA are excluded. But the statement does not establish that plaintiffs are correct. Fatal to plaintiffs' position is the complete absence of support in the 1980 record for their argument that only wastes unique to SWDA are excluded. The page 24 passage concerning section 101(14)'s incorporation of other environmental statutes by reference merely describes operation of the hazardous substances definition and does not support plaintiffs' limitation of the subdivision (C) exclusion. As RP notes, the passage also precedes the Committee's recognition on page 28 that excluded Bevill wastes may not be regulated under section 101(14) despite the presence in those wastes of otherwise hazardous or toxic chemicals. Finally, floor debate on the Bevill Amendment sheds no light on the intention underlying section 101(14) because enactment of the former predated enactment of the latter by nearly a year. Rep. Bevill's comments, made on February 20, 1980, also precede the relevant passage from the Senate Committee Report on CERCLA, issued on July 11, 1980.

The Committee's statement that excluded substances may not be regulated although hazardous or toxic supports RP's argument that Bevill Amendment wastes are excluded from the hazardous substances definition. *Also see, e.g.,* Freedman mem. at 5 ("Superfund legislative history tends to support the conclusion that RCRA-suspended wastes may never be considered 'hazardous substances' "). The passage states that a substance under the Bevill Amendment is "excluded from designation as a hazardous substance ... notwithstanding the presence in such substance of any hazardous or toxic chemical." In this court's view, the quoted language from the Committee Report is sufficiently clear and convincing that subsequent history need not and may not be consulted. *See GTE Sylvania,* 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13 ("even where it would otherwise be useful, subsequent legislative history

will rarely override reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment"). The language compels a conclusion that Bevill Amendment wastes are excluded from regulation under CERCLA although they may contain constituents that are hazardous within the meaning of some other federal statute.

Having so concluded, the court may not consider plaintiffs' arguments concerning the 1986 SARA legislative history. *See Oscar Mayer,* 441 U.S. at 759, 99 S.Ct. at 2073. Nor may the court consider whether to defer to EPA's subsequent interpretation of subdivision (C); agency interpretation cannot override the clearly-expressed intent of the enacting Congress. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), *reh'g den.,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984).

*IV. Conclusion.*

Because reconsideration is appropriate in the interests of justice, plaintiffs' motion for reconsideration is GRANTED.

But, having reconsidered the question that is the subject of plaintiffs' motion, the court again concludes that the 1980 legislative history dictates exclusion of Bevill Amendment wastes from regulation as hazardous substances within the meaning of section 101(14).

In light of the court's conclusion regarding section 101(14), plaintiffs' motions for summary judgment on, and/or to strike, the part of RP's second defense concerning exclusion of mining wastes are again DENIED.

IT IS SO ORDERED.